<u>**NOT FOR PUBLICATION**</u>

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x
                                              :
In re:                                        :
                                              :        Chapter 11
                                              :
Johns-Manville Corporation, *et al.*,         :
                                              :        Case No. 82-11656 (CGM)
                              Debtors.         :
                                              :
---------------------------------------------------------x

---------------------------------------------------------x
                                              :
Eric Bogdan and the Bogdan Law Firm,          :
                                              :
                              Plaintiffs,      :
                                              :
          v.                                  :
                                              :        Adversary No. 15-01023 (CGM)
Bevan & Associates, LPA, Inc., *et al.*       :
                                              :
                              Defendants.      :
---------------------------------------------------------x

## MEMORANDUM DECISION

<u>**A P P E A R A N C E S**</u> **:**

DuffyAmedeo, LLP
275 Seventh Avenue, 7th Floor
New York, NY 10001
*Counsel for Plaintiffs*
          By:     Todd E. Duffy
                  Douglas A. Amedeo

Otterbourg P.C.
230 Park Avenue
New York, NY 10169
*Counsel for Defendants*
          By:     Melanie L. Cyganowski
                  Richard G. Haddad
                  Stuart J. Wells

**CECELIA G. MORRIS**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

Plaintiffs Eric Bogdan and the Bogdan Law Firm ("Plaintiffs" or "Bogdan") filed this adversary proceeding against the law firms of Bevan & Associates, LPA, Inc. ("Bevan"), the Law Offices of Bruce Carter ("Carter"), and the Madeksho Law Firm, PLLC ("Madeksho") (collectively "Defendants"), to determine the proper allocation of an attorney fee award. Compl. ¶¶ 28–48, Feb. 3, 2015, ECF No. 1.[1] The attorneys' fees were established as part of a settlement agreement, so-ordered by this Court, in the Johns-Manville Corporation ("Manville") bankruptcy case. *See In re Johns-Manville Corp.*, 2004 Bankr. LEXIS 2519, at *113 (Bankr. S.D.N.Y Aug. 17, 2004), *aff'd in part, vacated in part*, 340 B.R. 49 (S.D.N.Y. 2006), *vacated sub nom. Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.)*, 517 F.3d 52 (2d Cir. 2008), *rev'd and remanded sub nom. Travelers Indem. Co. v. Bailey*, 557 U.S. 137 (2009).[2] This Court held a bench trial on the proper method of allocation and the appropriate amount of fees to be distributed among Plaintiffs and Defendants. This Court now finds that the $20 million in attorneys' fees are to be allocated pursuant to the terms of the so-ordered settlement agreement, in equal, one quarter parts of $5 million to Bogdan, Bevan, Carter, and Madeksho.

## JURISDICTION

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(a), 28 U.S.C. § 157(a) and the Standing Order of Reference signed by Chief Judge Loretta A. Preska dated January 31, 2012. This is a "core proceeding" under 28 U.S.C. § 157(b)(2)(A), involving matters concerning the administration of the estate.

---

[1] Unless otherwise indicated, all citations to litigation documents are to the docket of adversary proceeding 15-01023.
[2] Subsequent case history will be omitted after the first full citation.

## BACKGROUND

The genesis of this dispute is inextricably linked to the Manville bankruptcy and the continued attempts by asbestos plaintiffs to circumvent the channeling injunction created by Manville's confirmed chapter 11 plan of reorganization ("Plan").  Manville filed for bankruptcy on August 26, 1982 primarily due to "the mammoth problem of uncontrolled proliferation of asbestos health suits brought against it because of its substantial use for many years of products containing asbestos . . . ."  *In re Johns-Manville Corp.*, 36 B.R. 727, 729 (Bankr. S.D.N.Y. 1984).  Manville filed for bankruptcy to deal with so-called "future asbestos claimants," or "claimants exposed to the ravages of asbestos dust who ha[d] not as of the filing date manifested symptoms of asbestos disease."  *In re Johns-Manville Corp.*, 36 B.R. 743, 745 (Bankr. S.D.N.Y. 1984), *aff'd*, 52 B.R. 940 (S.D.N.Y. 1985).  Manville's financial inability to resolve the impending asbestos claims was a result of "the insurance industry's general disavowal of liability to Manville on policies written for this very purpose."  *In re Johns-Manville Corp.*, 36 B.R. 727, at 729.  Manville's "inability to look to at least $600 million in insurance coverage [wa]s a major factor in its decision to seek Chapter 11 relief."  *In re Johns-Manville Corp.*, 36 B.R. 743, at 750 (citations omitted).

Prior to filing for bankruptcy, "Manville and its insurers litigated over the scope and limits of liability coverage, and Travelers faced suits by third parties, such as Manville factory workers and vendors of Manville products, seeking compensation under the insurance policies," as well as suits from other insurers pursuing indemnity and contribution claims.  *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 141 (2009).  On September 15, 1983, during the early stages of Manville's bankruptcy, this Court extended the automatic stay to cover all direct actions against Manville's insurers as well as Manville's officers, directors and employees.  *Johns-*

*Manville Corp. v. Asbestos Litig. Grp. (In re Johns-Manville Corp.)*, 33 B.R. 254, 260, 263

(Bankr. S.D.N.Y. 1983).  This Court determined that "Manville's insurance policies constitute

one of its largest and most significant assets and are absolutely necessary for the formulation of

any reorganization plan." *Id.*   This Court based its reasoning on the fact that "Manville's

bankruptcy is primarily the result of the massive number of tort actions filed against it," and

Manville was, at the time, "being sued in tort for actions that may be covered under these

policies, and which the insurers may be called upon to defend, such insurance policies obviously

have value to the Manville estate." *Id.*  As such, "[t]he insurance assets are clearly fundamental

to any resolution of these tort actions in the context of a plan." *Id.*

As early as 1983, this Court found that any direct action suit against an insurer of

Manville would negatively impact Manville's bankruptcy estate by limiting the assets available

for Manville to put in trust for future asbestos claimants.  *Id.*  In a direct action suit against

Manville's insurers, any forced payout to an asbestos claimant would come out of the limited

insurance coverage Manville had purchased.  *Id.*  This Court concluded that "[t]his effect could

seriously undermine the whole purported purpose of Manville's bankruptcy petition, to wit:

reasonable compensation for all asbestos victims." *Id.* at 268.  As such, the insurance policies

were included as assets in Manville's bankruptcy estate.

Over the next several years,

the insurers agreed to settle with Manville for approximately $770 million.  The
settlements provided that, in exchange for cash payments, the insurers would be
relieved of all obligations related to the disputed policies and the insurers would
be protected from claims based on such obligations by injunctive orders of the
Bankruptcy Court.  The insurers [we]re entitled to terminate the settlements if the
injunctive orders are not issued or if they [we]re set aside on appeal.

*Macarthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 90 (2d Cir. 1988).  The insurance

settlement so-ordered by this Court ("Insurance Settlement Order") provided for the channeling

of all asbestos claims against the settling insurers "based upon, arising out of, or related to any or all of the Policies" to the Manville Trust; the release of the settling insurers from any further obligations "based upon, arising out of or related to the Policies . . . and all Policy ***Claims***"; and a "***permanent injunction***, specifically prohibiting all ***future claims*** for bad faith or insurer misconduct," and enjoining all persons from "commencing and/or continuing any suit, arbitration or other proceeding of any type or nature for Policy ***Claims*** against any or all members of the Settling Insurer Group . . . ." *In re Johns-Manville Corp.*, 2004 Bankr. LEXIS 2519, at \*42–43 (Bankr. S.D.N.Y. Aug. 17, 2004) (citations omitted). The language was intended to be very broad, as "Policy Claims" was defined to include any and all claims, known and as of yet unknown, "which have been, or could have been, or might be, asserted . . . against any or all members of the Settling Insurer Group based upon, arising out of or relating to any or all of the Policies." *Id.* (citations omitted).

The Insurance Settlement Order was incorporated in Manville's Plan which was confirmed by order entered on December 22, 1986 ("Confirmation Order"), and all asbestos-related claims against the settling insurers were enjoined. *See id.*; *see also In re Johns-Manville Corp.*, 68 B.R. 618, 624 (Bankr. S.D.N.Y. 1986), *aff'd* 78 B.R. 407 (S.D.N.Y 1987), *aff'd sub nom. MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89 (2d Cir. 1988). Amongst others, the settling insurers included the Travelers Indemnity Company, Travelers Casualty and Surety Company, and other affiliates ("Travelers"). *In re Johns-Manville Corp.*, 2004 Bankr. LEXIS 2519, at \*1, 42–43.

The proceeds from Manville's settlement with its insurers became the cornerstone of the Manville reorganization, providing the much-needed funding for the Manville Personal Injury Settlement Trust (the Manville "Trust") that was established for the benefit of future asbestos

claimants. *See In re Johns-Manville Corp.*, 97 B.R. 174, 177 (Bankr. S.D.N.Y. 1989); *In re Johns-Manville Corp.*, 68 B.R. at 621–22. The Manville Plan and Confirmation Order incorporated a channeling injunction, which was created to preserve the rights and interests of all "future asbestos claimants," defined as persons "who had been exposed to Manville's asbestos prior to the August 1982 petition date but had not yet shown any signs of disease at that time," by channeling their claims to the Manville Trust. *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 639 (2d Cir. 1988). The Second Circuit upheld both this Court's jurisdiction over the insurance policies as property of the estate and this Court's authority to issue the injunction to include settling insurers "pursuant to its power to dispose of a debtor's property free and clear of third-party interests and to channel such interests to the proceeds of the disposition." *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 90 (2d Cir. 1988).[3]

Despite the existence of the Insurance Settlement Order and the channeling injunction, asbestos plaintiffs continued to file state court actions against Travelers. *In re Johns-Manville Corp.*, 2004 Bankr. LEXIS 2519, at *48 (Bankr. S.D.N.Y. Aug. 17, 2004). These post-confirmation "direct action"[4] lawsuits against Travelers asserted so-called "novel" legal theories

---

[3] In *MacArthur*, the Second Circuit overruled an objection to the Insurance Settlement Order issued in connection with confirmation of Manville's Plan. The appealing party, MacArthur, was a distributor of Manville's asbestos and claimed to be "coinsured under the settled policies by virtue of 'vendor endorsements' contained in the policies." *MacArthur*, 837 F. 2d at 90. MacArthur argued that this Court did not have jurisdiction or authority to issue the channeling injunction as to the settling insurers. *Id.* In upholding this Court's jurisdiction and authority, the Second Circuit confirmed that Manville's insurance policies were central assets of the estate that would be diminished by third-party suits against the insurers. *Id.* at 92. The Second Circuit rejected the argument that MacArthur had contractual rights to sue Travelers separate from Manville's interest in the insurance policies. *Id.* at 92–93. The Second Circuit reasoned that any recovery MacArthur may have had against Travelers was still "derivative of Manville's rights as the primary insured." *Id.* at 92. MacArthur's rights were "no different in this respect from those of the asbestos victims who have already been barred from asserting direct actions against the insurers." *Id.* (citations omitted).

[4] "A true 'direct action' suit is '[a] lawsuit by a person claiming against an insured but suing the insurer directly instead of pursuing compensation indirectly through the insured.' Because many of the suits at issue seek to hold Travelers liable for independent wrongdoing rather than for a legal wrong by Manville, they are not direct actions in the terms of strict usage. Nonetheless, because the suits are referred to as 'direct actions' in the decisions of the Bankruptcy Court, the District Court, and the Court of Appeals, we call them that as well, in the interest of

in an attempt to hold the insurer directly liable for its own alleged misconduct. *Id.* at *48–60. The direct actions fell into two categories—those asserting statutory causes of action and those based on common law claims. *Id.* at *49. Both types of actions argued that Travelers had conspired with Manville to suppress evidence Manville was aware of the hazards of asbestos, and had engineered a fraudulent "no duty to warn" defense. *Id.* at *49–56.

These direct action lawsuits reached a critical mass in early 2002. Trial Tr. June 14, 2016, 11:19–20, June 24, 2016, ECF No. 213 ("Tr. 6/14/2016"). On June 19, 2002, Travelers filed its first order to show cause for a temporary restraining order in this Court, seeking to preliminary enjoin certain direct action asbestos lawsuits that had been filed against Travelers in various state courts. *See* Mem. Law Supp. Order to Show Cause, *In re Johns-Manville Corp.*, No. 82-11656 (Bankr. S.D.N.Y. June 19, 2002), ECF No. 3413. The Court granted the order to show cause the same day. Order to Show Cause, *In re Johns-Manville Corp.*, No. 82-11656, ECF No. 3412. On July 2, 2002, this Court entered a signed stipulated briefing schedule agreed to by Travelers and certain asbestos plaintiffs' attorneys, including Lawrence Madeksho. Stipulation, *In re Johns-Manville Corp.*, No. 82-11656, ECF No. 3425.

On August 1, 2002, this Court ordered mediation to resolve the pending direct action asbestos cases. Order Referring Matter to Mediation, *In re Johns-Manville Corp.*, No. 82-11656, ECF No. 3446. On January 22, 2003, Travelers filed another *ex parte* order to show cause to enjoin additional state law asbestos plaintiffs, primarily Bogdan's cases from Texas. Mem. Law Supp. Second Suppl. Order to Show Cause ¶¶ 2, 4, 5–6, *In re Johns-Manville Corp.*, No. 82-11656, ECF No. 3498. On January 27, 2003, this Court further enjoined the additional direct action cases and included them in the order of mediation. *See* Suppl. Order to Show Cause, *In re*

---

simplicity." *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 143 n.2 (2009) (quoting *Direct Action*, Black's Law Dictionary (8th ed. 2004)) (further citations omitted).

*Johns-Manville Corp.*, Case No. 82-11656, ECF No. 3474.  Exhibit C to the supplemental order

to show cause includes a list of cases to be referred to mediation entitled "The Eric Bogdan and

Lawrence Madeksho Lawsuits."  *Id.* at Ex. C.  Bogdan, Madeksho, Bevan and Carter all

participated in the mediation talks with Travelers.  Tr. 6/14/2016 at 20:24–25 (testimony of

Travelers' counsel at the time, Mr. Andrew Frankel, in response to who participated in the

mediation sessions).

Ultimately, the mediation resulted in three separate settlement agreements resolving the

direct action claims: the Hawaii Direct Action Settlement Agreement, the Statutory Direct

Action Settlement Agreement, and the Common Law Direct Action Settlement Agreement

("Common Law Settlement Agreement").  Tr. 6/14/2016 at 13:15–17; Mot. Approve Statutory

Settlement Agreement, *In re Johns-Manville Corp.*, No. 82-11656, ECF No. 3568; Mot. Approve

Hawaii Settlement Agreement, *In re Johns-Manville Corp.*, No. 82-11656, ECF No. 3627; Mot.

Approve Common Law Settlement Agreement, *In re Johns-Manville Corp.*, No. 82-11656, ECF

No. 3636.  Each of the three settlement agreements established a new asbestos plaintiffs' fund,

separate and apart from the Manville Trust.  *In re Johns-Manville Corp.*, 2004 Bankr. LEXIS

2519, at *113 (Bankr. S.D.N.Y. Aug. 17, 2004).  Additionally, each settlement agreement

established its own attorney fee fund.  *Id.*  The Court took testimony indicating that the

attorneys' fees established by the Common Law Settlement Agreement were to be paid to

"Settlement Counsel," a defined term that included Bogdan, Madeksho, Carter, and Bevan.  Trial

Transcript July 6, 2004 51:9–74:9, *In re Johns-Manville Corp.*, No. 82-11656, ECF No. 3818;

Defs.' Ex. 2, ¶ 1(r).  On August 17, 2004, the settlement agreements and attorney fee funds were

approved by this Court after an evidentiary hearing and over many objections.  *In re Johns-
Manville Corp.*, 2004 Bankr. LEXIS 2519, at *113.

Travelers wanted certain condition precedents to be incorporated in the settlement agreements.  For the Common Law Settlement Agreement, Travelers insisted it receive 14,000 general releases from the existing asbestos plaintiffs within 60 days of the Bankruptcy Court's order becoming a final order.  *Id.* at *62–63; Defs.' Ex. 2, ¶2(c).  Two other conditions precedents required the Bankruptcy Court to approve the settlement agreements, and to issue an order finding that the direct action lawsuits had always been enjoined by Manville's Confirmation Order and the Insurance Settlement Order.  *In re Johns-Manville Corp.*, 2004 Bankr. LEXIS 2519, at *3–4.  This Court found that the direct action suits against the settling insurers had always been barred.  *Id.* at *84.

Based on the evidence, this Court found that when Travelers originally sought the protection of the bankruptcy court in 2002

> the plaintiffs in both the Statutory and Common Law Direct Action Lawsuits denied that their claims fell within the scope of this Court's [1986 Manville Confirmation and Insurance Settlement] orders. Two years, countless submissions and a full evidentiary hearing later, these objections have withered away and the evidence on the record and before this Court conclusively establishes that the direct action claims against Travelers are inextricably intertwined with Travelers long relationship as Manville's insurer.

*Id.* at *84.  In coming to this conclusion, the Court found that the direct action lawsuits were little more than an attempt to replace Manville with other solvent companies to pay for Manville's discharged debts.  *See id.* at *21, 32–33, 48, 53 (citations omitted).  In particular, this Court found that "notwithstanding its bankruptcy and resulting immunity from suit - asbestos plaintiffs still litigate against the 'ghost' of Manville by attempting 'to place asbestos defendants into the shoes of Manville through 'conspiracy' theories to tarnish the defendants with the old and damaging Manville evidence . . . .'"  *Id.* at *32.  In analyzing the common law direct action lawsuits specifically, this Court noted that "[a] common law direct action plaintiffs' attorney

Bruce Carter's affidavit candidly admits, no court has ever accepted these theories." *Id.* at *53.

The Court continued, stating that "[t]hese plaintiffs, too, are dissatisfied with their inability to

collect directly from Manville, and thus attempt to collect Manville's debts by 'Putting New

Defendants In Manville's Chair.'" *Id.* at *53 (citations omitted).

This Court's order that the direct action suits against settling insurers had always been

barred by Manville's Confirmation Order and the Insurance Settlement Order was appealed all

the way to the Supreme Court. *See Travelers Indem. Co. v. Bailey*, 557 U.S. 137 (2009). On

appeal from the District Court, the Second Circuit reversed, finding that the Bankruptcy Court

did not have jurisdiction to enjoin third party claims against the settling insurers for so-called

"direct action" claims for the insurers' own wrongdoing. *Johns-Manville Corp. v. Chubb Indem.

Ins. Co. (In re Johns-Manville Corp.)*, 517 F.3d 52, 66–67 (2d Cir. 2008), *reversed sub nom.

Travelers Indem. Co. v. Bailey*, 557 U.S. 137 (2009). Ultimately, the Supreme Court decided

that Manville's 1986 Confirmation Order was *res judicata*, and the issue of subject matter

jurisdiction was not properly before the Second Circuit. *Travelers*, 557 U.S. at 151–53. The

Supreme Court left open the issue of whether any particular party had received adequate due

process. *Id.* at 155. On remand, the Second Circuit held that the appellant, Chubb, had not

received sufficient notice as to the treatment of its claim  in the process leading up to Manville's

Confirmation Order, and that as a result Chubb was not bound by the Bankruptcy Court's 2004

orders interpreting the original 1986 Manville Confirmation Orders. *See Johns-Manville Corp.

v. Chubb Indemnity Ins. Co. (In re Johns-Manville Corp.)*, 600 F.3d 135, 137 (2d Cir. 2010).

The Second Circuit's ruling in *Chubb* set off another round of appeals over the validity of

the settlement agreements. Travelers contended that the settlement agreements were now void,

as this Court's 2004 order that the direct action claims were barred by Manville's Confirmation

Order did not apply to Chubb.  After another round of appeals, the Second Circuit affirmed this

Court's order compelling Travelers to pay on the settlement agreements.  *Common Law*

*Settlement Counsel v. Travelers Indem. Co. (In re Johns-Manville Corp.)*, 759 F.3d 206, 217 (2d

Cir. 2014).

On January 9, 2015, Travelers filed an emergency motion to deposit the attorneys' fees

due under the Common Law Settlement Agreement and the Statutory Settlement Agreement into

the court registry.  Travelers' Mot. to Deposit Disputed Funds, *In re Johns-Manville Corp.*, Case

No. 82-11656, ECF No. 4141.  Travelers had been working with counsel for all three settlement

agreements to reach an understanding on post-judgment interest and to obtain instructions for

how to deposit the funds so that Travelers could promptly satisfy the judgment.  Despite the

attempt to resolve these issues, "Travelers [was] informed, however, that certain parties dispute

their potential right and entitlement to attorneys' fees under the Common Law Direct Action

Settlement Agreements and Statutory Direct Action Settlement Agreements."  *Id.* at 1.  As the

attorneys could not agree on the allocation, Travelers asked that the funds be paid into the

Court's registry until the disputes were resolved.

Madeksho and Carter objected to Travelers' motion as to the Common Law Settlement

Agreement attorneys' fees.  Common Law Counsel's Obj. to Travelers Mot. to Deposit Fees, *In*

*re Johns-Manville Corp.*, Case No. 82-11656, ECF No. 4146-1.  Madeksho and Carter argued

that "ownership of the attorneys' fees is not in dispute.  Under the Agreement, only the Common

Law Settlement Counsel have an entitlement to the fees.  All that has yet to be resolved is the

individual distributions of the fees among Common Law Settlement Counsel."  *Id.* at 2.

Madeksho and Carter argued Bogdan was the sole reason for the dispute.  This Court granted

Travelers' motion over Madeksho and Carter's objections, directing Travelers to deposit the

attorneys' fees into escrow accounts with New York banks, and requiring an order of this Court to release any of those funds.  Order Resolving Mot. of Travelers ¶¶ 8–9, *In re Johns-Manville Corp.*, No. 82-11656, ECF No. 4150.   On February 3, 2015, this action followed.  Compl. ¶¶ 28–48.

On February 25, 2015, Plaintiffs filed an amended complaint seeking a determination by this Court of the parties' respective entitlement to the attorneys' fees created by the Common Law Settlement Agreement.  Amended Compl. ¶¶ 58–66, Feb. 25, 2015, ECF No. 14.  To determine the method of allocation and the amount to be distributed to each of the four parties, this Court held a full, three-day evidentiary trial from June 13, 2016 to June 15, 2016.

In the parties' joint pre-trial order ("JPTO"), the parties set forth the following issues to be tried, with substantially identical language:

(i) The proper method for allocating the Legal Fees;
(ii) If the Court determines that *quantum meruit* is as [sic] the proper method of allocation, then
    (a) Determination as to what legal work by the Parties is to be compensated; and
    (b) Determination of the value of such legal work so as to determine each Parties' percentage share of the Legal Fees.
(iii) Determination as to whether Bogdan is entitled to any payment or to a reduction in payment due to his allege failure to use his best efforts to satisfy a condition precedent to settlement;
(iv) Determination as to whether Bogdan's conduct following execution of the Amended Agreement precludes him from receiving any benefits under the Amended Agreement, including the receipt of Legal Fees;
(v) Determination of the portion of legal fees and expenses incurred by the Defendants in connection with successfully upholding and enforcing the Amended Agreement that must be reimbursed by Bogdan;

and, as set forth by the Plaintiffs and agreed to by Defendants, (vi) a "Determination of Bevan's entitlement to payment due to his renouncement of a share of the allocation by agreement with Madeksho and Carter."  JPTO ¶ VII, May 4, 2016, ECF No. 185.

Plaintiffs contend that the attorneys' fees should be distributed on a pro rata basis.  In Plaintiffs' pre-trial brief, Plaintiffs argued that Bevan should be excluded from this distribution, and that the funds should be distributed in thirds to Bogdan, Madeksho, and Carter.  Trial Br. Pls. 23, June 1, 2016, ECF No. 207.  At trial, after Plaintiffs had rested their case in chief on June 14, 2016, Defendants moved for judgment on partial findings under Federal Rule of Civil Procedure 52(c), incorporated and made applicable in this adversary proceeding by Federal Rule of Bankruptcy Procedure 52, on three of Plaintiffs' claims, including Bevan's exclusion from distribution.[5]  Tr. 6/14/2016 at 69:12–72:9.  Defendants claimed that Plaintiffs failed to present any evidence to support "the entry of a declaratory judgment excluding Bevan from any distribution from the Common Law Settlement Counsel Attorney Fee Fund."  JPTO at ¶ III(a)(iii); Tr. 6/14/2016 at 70:4–14.  This Court took a brief recess, after which it granted Defendants' motion for judgment on partial findings as to the exclusion of Bevan, finding that Plaintiffs' had failed to provide any evidence prior to the close of their case to show Bevan had waived his share of the $20 million attorney fee fund.  Tr. 6/14/2016 at 76:9–81:5.  This leaves Plaintiffs with the claim that the attorney fee fund should be distributed equally, on a pro rata basis, among the four Settlement Counsel.

---

[5] Defendants moved for judgment on three issues.  In addition to Plaintiffs' failure to provide any evidence to support their claim that Bevan should be excluded, Defendants also sought judgment on the issue of "best efforts," claiming Plaintiffs had failed to present any evidence Bogdan used his best efforts to obtain the outcomes sought under the Common Law Settlement Agreement.  Tr. 6/14/2016 at 71:5–9.  Defendants claimed that by virtue of the fact Bogdan admitted he did not obtain any of the releases, Bogdan could not show he used his best efforts to satisfy the condition precedent to the Common Law Settlement Agreement requiring Settlement Counsel to obtain 14,000 releases.  Tr. 6/14/2016 at 71:10–24.  As for the third issue, Defendants claimed that Bogdan individually, separate and apart from the Bogdan Law Firm, should not receive any part of the fees, as the only party identified as Settlement Counsel was the Bogdan Law Firm.  Tr. 6/14/2016 at 71:25–72:6.  The Court declined to render judgment on Defendants' motion for judgment on partial findings as to best efforts and Bogdan's personal entitlement to the attorneys' fees.  Tr. 6/14/2016 at 76:9–81:5.  Upon further review of the issues Defendants put forward to be determined at trial, Bogdan's individual entitlement to fees was not among them, nor was any credible evidence offered on this point.  To the extent this argument is not already waived by Defendants' failure to raise it prior to trial, the Court denies Defendants' motion as to Bogdan's personal entitlement to the attorneys' fees as untimely and without merit.

In their pre-trial brief, Plaintiffs contend that a pro rata distribution is the only feasible method of recovery, as a quantum meruit theory of allocation would not be possible on these facts. Trial Br. Pls. 14–22. Plaintiffs argued that quantum meruit cannot be applied where Settlement Counsel represented different plaintiffs, there are no billing records to account for time spent, there is no way to determine who's efforts actually contributed to Travelers' decision to settle, and it would be impossible to value novel theories, facts or documents. *Id.*

In Defendants' pre-trial brief, Defendants argued that there is no governing contract allocating the fees and, as such, New York law requires recovery under quantum meruit. Defs.' Pre-Trial Br. 19–21, June 1, 2016, ECF No. 206. Defendants argued that Bogdan did not actively participate in the settlement negotiations and even took actions to frustrate the consummation of the settlement. *Id.* at 21. Defendants argue that this justifies a downward reduction in his fees. *Id.* Although Defendants claimed there is no contract governing allocation, Defendants asserted Bogdan breached the contract by failing to make his "best efforts" to obtain any of the required 14,000 releases that were a condition precedent to the Common Law Settlement Agreement. *Id.* at 24–27. Defendants also claimed that in refusing to obtain the required releases, Bogdan violated Rule 1.1(c) of the New York Rules of Professional Conduct by taking actions detrimental to his clients. *Id.* at 27–28.

## <u>DISCUSSION</u>

### 1. **Parties' Background**

Both Plaintiffs and Defendants filed common law direct action lawsuits against Travelers prior to 2002. Tr. 6/14/2016 at 8:23-9:6 (Andrew Frankel's testimony as counsel for Travelers in the Manville bankruptcy proceedings beginning around 2002). Madeksho brought one of his first direct action asbestos cases against the insurance companies in 1988, amending the complaint to add Travelers in 1991. Tr. 6/14/2016 at 91:18–93:14 (Madeksho's testimony); Pls.

Exs. 6(a), 6(b) (Petition and Amended Petition, *Searls v. Owens-Corning Fiberglass Corporation*, No. 88-C-0615 (Dist. Ct. of Brazoria County, 23rd Dist. of Texas)); Defs.' Ex. 204 (email from Carter with attached copies of Traveler's and Aetna's 1993 motions for summary judgment in *Searls*).  Madeksho testified that he had around 20 clients who were suing Travelers under direct action theories.  Tr. 6/14/2016 at 169:5–6; Def.'s Ex. 233 (affidavit of Donald. E. Ward, appointed as the Travelers Common Law Settlement Fund Administrator).

Bogdan, a Texas practitioner, filed his first direct action case against Travelers in 1998.  Trial Tr. June 13, 2016, 116:22–117:3; 125:25–126:17, June 15, 2016, ECF No. 212 ("Tr. 6/13/2016") (Bogdan's testimony); Pls.' Ex. 54.  Bogdan first met Madeksho sometime in 1993 or 1994, before he filed his first direct action case.  Tr. 6/13/2016 at 155:25–156:1.  By 2003, Bogdan had between 650 and 750 clients for whom he had filed direct action complaints against Travelers.  Tr. 6/13/2016 at 126:1–14 (Bogdan's testimony).  Bogdan admitted that Madeksho referred about 20 clients to him.  Tr. 6/13/2016 at 156:17–18.

Although Bogdan and Madeksho had some sort of informal, co-counsel relationship in 1997, it did not cover Bogdan's first direct action case against Travelers.  Tr. 6/13/2016 at 156:19–21; 166:19–167:10 (Bogdan's testimony).  Bogdan may have "used [Madeksho's] work to do one complaint," and Madkesho seems to have provided general assistance when Bogdan asked for his help.  Tr. 6/14/2016 at 147:20–148:2 (Madeksho's testimony).  Bogdan also contributed to some of Madeksho's direct action cases against Travelers in an informal manner.  Tr. 6/13/2016 at 157:3–21 (Bogdan's testimony).  There was never any formal, written agreement between Bogdan and Madeksho.  Tr. 6/13/2016 at 167:7, 168:1–24 (Bogdan's testimony); Tr. 6/14/2016 at 166:23–167:5 (Madeksho's testimony).  It was not until 2002, after Bogdan met Carter in 2001, that Bogdan and Madeksho developed a more formal co-counsel

relationship as to the Travelers' cases. Tr. 6/13/2016 at 167:7 (Bogdan's testimony). Bogdan's

cases eventually became part of Madeksho's nationwide direct action lawsuit project. Trial Tr.

June 15, 2016, 200:21–22, June 24, 2016, ECF No. 214 ("Tr. 6/15/2016") (Carter's testimony).

Still, unlike Carter and Bevan, Bogdan did not have a fee sharing arrangement with Madeksho to

split any of Bogdan's fees. Tr. 6/14/2016 at 167:1–5 (Madeksho's testimony).

Carter became involved in the national litigation scheme against Travelers sometime

during 2001. Tr. 6/15/2016 at 1–23. Carter testified that he orchestrated the nationwide

coordination of direct action lawsuits against Travelers in late 2001, after assisting in a Hawaii

case against another insured of Travelers. Tr. 6/15/2016 at 118:20-119:23 (Carter's testimony).

Joining forces with Hawaii plaintiffs' counsel, Carter reached out to Madeksin in 2001 to

institute a national litigation project against Travelers, believing Madeksho "was the Travelers

expert." Tr. 6/15/2016 at 119:24-25 (Carter's testimony). Carter knew of Madeksho's work

against the insurance companies in the 1990s and Madeksho had shared evidence of Travelers'

"liability" with Carter. Tr. 6/15/2016 at 120:5-12 (Carter's testimony). Later that year, Carter

and Madeksho initiated a nationwide direct action project made up of asbestos lawyers who

"agreed to work together as a consortium of firms to pursue Travelers . . . ." Tr. 6/15/2016 at

123:2-4, 128:2-8 (Carter's testimony). The project was first expanded to include Bogdan's

Texas cases. Tr. 6/15/2016 at 128:3–16 (Carter's testimony). Carter's role in the project was

"drafting" and court appearances. Tr. 6/15/2016 at 130:14-17 (Carter's testimony). Carter also

"assisted" with Bogdan and Madeksho's direct action cases and furthered the growth of the

nationwide direct action project. Tr. 6/15/2016 at 127:10–15; 130:12–131:7 (Carter's

testimony). Carter only had "a small handful" of clients that were parties to the Common Law

Settlement Agreement. Tr. 6/15/2016 at 110:11–22 (Bevan's testimony); Defs.' Ex. 233.

Carter and Bevan had worked together prior to Madeksho's involvement.  Tr. 6/15/2016 at 16:6–11 (Bevan's testimony), 130:19-22 (Carter's testimony).  Carter and Bevan both worked on the same type of asbestos cases and collaborated on some of them.  Tr. 6/15/2016 at 16:1–5 (Bevan's testimony).  Sometime in 2002, Carter introduced Madeksho to Bevan "and other attorneys in Ohio," who were brought in as co-counsel.  Tr. 6/15/2016 at 16:6–11 (Bevan's testimony), 130:19-22 (Carter's testimony).  Even as late as 2003, Carter and Madeksho "were gathering the cases together from different attorneys, not just Mr. Bevan and not just the Texas cases, and [he] was just keeping a tally, or a case count, on how many cases, say, the Simmons firm or the Richardson Patrick firms were offering to bring into the mix at the time."[6]  Tr. 6/15/2016 at 140:3–8, 142:21–23 (Carter's testimony); Defs.' Exs. 169, 172.  By adding cases from around the country, they were able to make the direct action project more successful.  Tr. 6/15/2016 at 145:23–146:5 (Carter's testimony).  Carter testified that he has a fee splitting arrangement with Madeksho, subject to which Carter is to receive 20% of the attorneys' fees Madeksho receives on the nationwide direct action project.  Tr. 6/15/2016 at 184:9–21 (Carter's testimony).

Bevan, one of the Ohio lawyers already involved in asbestos litigation, had been mainly suing "the manufacturers of the asbestos products or the suppliers of the asbestos products or perhaps the employers or the premises owners of those."  Tr. 6/15/2016 at 14:4–7 (Bevan's testimony).  Prior to meeting with Madeksho, Bevan himself had not brought any direct action claims against Travelers.  Tr. 6/15/2016 at 17:13-20 (Bevan's testimony).  After meeting with Madeksho in 2002, Bevan amended his existing asbestos cases sometime in 2003 to assert new causes of action against Travelers, using documents Madeksho and Carter provided to him.  Tr.

---

[6] Carter described these referring counsel as quasi "settlement counsel" in his testimony.  Tr. 6/15/2016 at 167:17–21.

6/15/2016 at 15:18–16:22, 17:21–25.  Bevan eventually represented between 11,000 and 12,000

clients who had pending direct action lawsuits against Travelers.  Tr. 6/15/2016 at 60:4–5;

110:3–5 (Bevan's testimony on direct and cross-examination).  Bevan and Madeksho had a

formal co-counsel relationship, involving a fee splitting arrangement that Bevan's clients were

made aware of, and Madeksho met with Bevan's clients.  Tr. 6/15/2016 at 14:18–15:5, 99:19–

100:3, 101:8–9 (Bevan's testimony).  Pursuant to Bevan's fee splitting arrangement with

Madeksho, Madeksho is to receive 50% of the attorneys' fees generated by Bevan's cases that

were part of the nationwide direct action project.  Tr. 6/15/2016 at 14:8–15:5 (Bevan's

testimony).

　　　　Mr. Andrew Frankel ("Frankel") first represented Travelers in the bankruptcy court

"around the 2002 time period when various groups of asbestos plaintiffs' lawyers started suing

Travelers in . . . direct action litigation."  Tr. 6/14/2016 at 7:18–22.  Frankel was part of the team

of lawyers representing Travelers in the bankruptcy proceedings at that time.  Tr. 6/14/2016 at

11:19–24.  Frankel also represented Travelers at the mediation sessions.  Tr. 6/14/2016 at 20:15–

18.  Frankel remembered that all four parties, Bogdan, Carter, Bevan and Madeksho, participated

in the common law Travelers mediation sessions that were so-ordered by this Court.  Tr.

6/14/2016 at 20:24–25 (testimony from Mr. Frankel).  It was these mediation sessions that led to

the Common Law Settlement Agreement.  Tr. 6/15/2016 at 48:17–56:6 (Bevan's testimony

regarding which mediation session resulted in the signed Common Law Settlement Agreement).

　　　　In the Common Law Settlement Agreement, Travelers proposed to pay $70 million to the

Common Law Direct Action Settlement Fund for the benefit of asbestos claimants, and also

promised to pay $20 million in attorneys' fees.  *See* Defs.' Ex. 2, ¶ 3.  In approving the Common

Law Settlement Agreement, this Court approved both the $70 million payment to the Common

Law Direct Action Settlement Fund and the $20 million in attorneys' fees as "fair, equitable and reasonable in light of the complexity of the litigations and the size of the recoveries for the . . . Direct Action Plaintiffs . . . ." *In re Johns-Manville Corp.*, 2004 Bankr. LEXIS 2519, at *113 (Bankr. S.D.N.Y. Aug. 17, 2004).  The Court based its opinion on testimony from Carter stating the attorneys' fees were to go to Settlement Counsel and that the entire amount was not all going to him.  Trial Transcript July 6, 2004 58:6–18, *In re Johns-Manville Corp.*, No. 82-11656, ECF No. 3818.  In the Court's opinion, negotiating the resolution of complicated litigation and the size of the recovery to the direct action plaintiffs justified the award of the attorneys' fees.  At the time, there was no indication that the attorneys' fees were to be divided unequally among Settlement Counsel, or any indication that particular counsel had earned more compensation than others.

Now, over ten years after the Common Law Settlement Agreement was executed, Carter, Bevan and Madeksho claim that the $20 million was never intended to be distributed evenly among all four Settlement Counsel.  Defendants claim there was no agreement on allocation, and that as a result the attorneys' fees must be distributed on a quantum meruit basis.  Defs.' Pre-Trial Br. 19–21.  Even Bogdan asserted at trial that there was no "agreement amount . . . as to how the fees would be divided among the four" Settlement Counsel.  Tr. 6/13/2016 at 146:14–18.

### 2.  There is a Valid, Enforceable Contract

In New York, where there is a valid, enforceable agreement that expressly addresses how attorneys' fees should be split, and there is no breach of contract, a quantum meruit approach to the distribution of attorneys' fees is not merited under the law of contracts.  *Stissi v. Interstate & Ocean Transp. Co.*, 814 F.2d 848, 849 (2d Cir. 1987).  On the other hand, where there is no

valid, enforceable contract, "the Court must turn to principles of quantum meruit to fix the movants' fee." *Metrano v. Eisen*, 1993 U.S. Dist. LEXIS 452, at *3 (S.D.N.Y. Jan. 19, 1993). This is based on the principal that an attorney is entitled to recover for services performed. *See, e.g.*, *Burstein v. Long*, 2016 U.S. Dist. LEXIS 51599, at *11–12 (S.D.N.Y. Apr. 18, 2016). Thus, the Court must first determine whether there was a valid, enforceable contract allocating the attorneys' fees.

"The fundamental objective of contract interpretation is to give effect to the expressed intentions of the parties." *Klos v. Lotnicze*, 133 F.3d 164, 168 (2d Cir. 1997) (citing *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir.1989)). "When interpreting the meaning of a contract it is the objective, and not the subjective intent of the parties which controls." *Swaminathan v. Swiss Air Transp. Co.*, 962 F.2d 387, 389 (5th Cir. 1992). "The secret or subjective intent of the parties is irrelevant." *Klos*, 133 F.3d at 168 (citations omitted).

Regardless of the parties' assertions that there was never an agreement, "whether, based on the factual findings, a binding contract existed -- is a question of law" for the Court to decide. *Shann v. Dunk*, 84 F.3d 73, 77 (2d Cir. 1996); *see also Vacold LLC v. Cerami*, 545 F.3d 114, 123 (2d Cir. 2008). "Under traditional principles of contract law, questions as to what the parties said, what they intended, and how a statement by one party was understood by the other are questions of fact; however, the matter of whether or not there was a contract, in light of the factual findings on these questions, is an issue of law." *Ronan Assocs. v. Local 94-94A-94B, Int'l Union of Operating Eng'rs*, 24 F.3d 447, 449 (2d Cir. 1994) (citing *Four Seasons Hotels, Ltd. v. Vinnik*, 515 N.Y.S.2d 1, 6 (N.Y. App. Div. 1987); *Cortland Asbestos Products, Inc. v. J. & K. Plumbing & Heating Co.*, 304 N.Y.S.2d 694, 696 (N.Y. App. Div. 1969)).

"A settlement agreement is a contract that is interpreted according to general principles of contract law." *Omega Eng'g, Inc. v. Omega, S.A.*, 432 F.3d 437, 443 (2d Cir. 2005) (citing *Collins v. Harrison-Bode*, 303 F.3d 429, 433 (2d Cir. 2002)). "To form a valid contract under New York law, there must be an offer, acceptance, consideration, mutual assent and intent to be bound." *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 507 (2d Cir. 2009) (internal quotation marks omitted) (quoting *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004)). "Under New York law, 'mutual assent is essential to the formation of a contract and a party cannot be held to have contracted if there was no assent or acceptance.'" *Register.com, Inc.*, 356 F.3d at 427 (quoting *Maffea v. Ippolito*, 668 N.Y.S.2d 653, 654 (N.Y. App. Div. 1998)).

To find that there was mutual assent, there must have been a "meeting of the minds on all essential terms . . . ." *Schurr v. Austin Galleries of Ill., Inc.*, 719 F.2d 571, 576 (2d Cir. 1983). "Whether there has been a meeting of the minds on all essential terms is a question of fact that must be resolved by analyzing the totality of the circumstances." *Benicorp Ins. Co. v. Nat'l Med. Health Card Sys.*, 447 F. Supp. 2d 329, 337 (S.D.N.Y. 2006) (citing *United States v. Sforza*, 326 F.3d 107, 116 (2d Cir. 2003); *Bazak Int'l Corp. v. Tarrant Apparel Group*, 378 F. Supp. 2d 377, 389 (S.D.N.Y. 2005)). To find mutual assent as to all essential terms, there must have been an offer with sufficiently definite terms. *See Missigman v. USI Ne., Inc.*, 131 F. Supp. 2d 495, 506 (S.D.N.Y. 2001).

"Few principles are better settled in the law of contracts than the requirement of definiteness. If an agreement is not reasonably certain in its material terms, there can be no legally enforceable contract." *Missigman*, 131 F. Supp. 2d at 506 (citing *Cobble Hill Nursing Home, Inc. v. Henry and Warren Corp.*, 548 N.E.2d 203, 206 (N.Y. 1989)). The fact that there is a fully executed contract here is evidence that there was an objective meeting of the minds. *See*

*Ipcon Collections LLC v. Costco Wholesale Corp.*, 698 F.3d 58, 62 (2d Cir. 2012).  To determine

whether the material terms were sufficiently definite, the Court must begin with the language of

the contract at issue.  *See, e.g.*, *Express Indus. & Terminal Corp. v. New York State DOT*, 715

N.E.2d 1050, 1053 (N.Y. 1999), *cited with approval in Benicorp Ins. Co. v. Nat'l Med. Health

Card Sys.*, 447 F. Supp. 2d 329, 337 (S.D.N.Y. 2006).  Although a "mere agreement to agree, in

which a material term is left for future negotiations, is unenforceable," *Tractebel Energy Mktg. v.

AEP Power Mktg.*, 487 F.3d 89, 95 (2d Cir. 2007) (internal quotation marks omitted) (quoting

*Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 417 N.E.2d 541, 543 (N.Y. 1981)), not all

contractual terms must be defined beyond a doubt for there to be a binding, enforceable contract.

*See, e.g.*, *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 72 (2d Cir. 1989).

      The Common Law Settlement Agreement was first executed on May 21, 2004 and

amended on May 25, 2004.  Defs.' Ex. 2, at 1, 16; Tr. 6/13/2016 at 144:19–23, 146:2–9

(Bogdan's testimony).  The Common Law Settlement Agreement states that it was "made and

entered into by and between (i) the Settlement Counsel (as defined herein) on behalf of all

Persons (as defined herein) identified on Exhibit C who have or may assert Common Law Direct

Action Claims (as defined herein) and (ii) The Travelers Indemnity Company . . . ."  Defs.' Ex.

2, at 1.  Per the definitions in the Common Law Settlement Agreement, "'Parties' shall mean all

Persons identified on Exhibit C, Settlement Counsel, and Travelers."  Defs.' Ex. 2, ¶ 1(m).  The

Common Law Settlement Agreement defines "Settlement Counsel" to include the Law Offices

of Lawrence Madeksho LLC, Law Offices of Bruce Carter, Bevan & Associates LPA Inc., and

the Bogdan Law Firm, "as representatives and counsel of Persons listed on Exhibit C."  Defs.'

Ex. 2, ¶ 1(r).  Persons listed on Exhibit C were indirectly defined as persons with "Common Law

Direct Action Claims" against Travelers.  Defs.' Ex. 2, ¶ 1(e).

When the Common Law Settlement Agreement became final, all plaintiffs identified on Exhibit C were to dismiss their existing lawsuits with prejudice against Travelers.  Defs.' Ex. 2, ¶ 6.  As a condition precedent to the entire Common Law Settlement Agreement, Settlement Counsel were required to obtain and deliver 14,000 releases from their collective clients.  The Common Law Settlement Agreement further provided that Settlement Counsel were to create a settlement fund, from which the Settlement Fund Administrator would pay qualifying claims "in accordance with procedures to be approved by the Court."  Defs.' Ex. 2, ¶ 4(a)–(b).  At the time of the hearing on the Common Law Settlement Agreement, the fund distribution procedures had not been drafted yet.  The Court approved the Common Law Settlement Agreement without a finalized distribution procedure, as "appropriately provid[ing] for 'ultimate resolution of the distribution scheme by an outside neutral party' . . . ."  *In re Johns-Manville Corp.*, 2004 Bankr. LEXIS 2519, at *83 (quoting *Nellis v. Shugrue*, 165 B.R. 115, 126 (S.D.N.Y. 1994).

The parties do not dispute that the Common Law Settlement Agreement is a valid, enforceable contract.  Instead, the issue is whether the terms of the Common Law Settlement Agreement address the allocation of the attorneys' fees provided for therein.  The Common Law Settlement Agreement proposes to pay $70 million to the Common Law Direct Action Settlement Fund, and $20 million of attorneys' fees without defining the word "attorneys."  *See* Defs.' Ex. 2, ¶ 3.  The Common Law Settlement Agreement instead defines the term "Settlement Counsel" to include Plaintiffs and Defendants here, named as the "(i) Law Offices of Lawrence Madeksho LLC; (ii) Law Offices of Bruce Carter; (iii) Bevan & Associates LPA Inc.; and (iv) The Bogdan Law Firm as representatives and counsel of Persons listed on Exhibit C."  Defs.' Ex. 2, ¶ 1(r).

Even though the Common Law Settlement Agreement does not state to whom or how the attorneys' fees are to be distributed, that does not mean the failure to so provide is proof that there was no agreement.  If

> at the time of agreement the parties have manifested their intent to be bound, a price term may be sufficiently definite if the amount can be determined objectively without the need for new expressions by the parties; a method for reducing uncertainty to certainty might, for example, be found within the agreement or ascertained by reference to an extrinsic event, commercial practice or trade usage.

*Cobble Hill Nursing Home v. Henry & Warren Corp.*, 548 N.E.2d 203, 206 (1989), *cited with approval in Arbitron, Inc. v. Tralyn Broad., Inc.*, 400 F.3d 130, 136 (2d Cir. 2005).

Manifestation of assent need not be explicit:

> "manifestation or expression of assent necessary to form a contract may be by word, act, or conduct which evinces the intention of the parties to contract."  A party's conduct indicates assent when "he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents."

*Leibowitz v. Cornell Univ.*, 584 F.3d 487, 507 (2d Cir. 2009) (first quoting *Maffea v. Ippolito*, 668 N.Y.S.2d 653, 654 (N.Y. App. Div. 1998); then quoting Restatement (Second) of Contracts ch. 3, topic 2, § 19(2) (Am. Law Inst. 1981)).  The question is whether at the time of execution, the parties had nonetheless agreed to a distribution of the attorneys' fees and whether that intention can be derived from the terms of the Common Law Settlement Agreement or from extrinsic evidence.

### 3.  The Reference to Payment of "Attorneys' Fees" is Ambiguous

Paragraph three of the Common Law Settlement Agreement is entitled "Payment of Settlement Amount."  Defs.' Ex. 2, ¶ 3.  Per its terms, Travelers is to pay "(1) Seventy million dollars ($70,000,000) to the Common Law Direct Action Settlement Fund; and (2) Twenty

million ($20,000,000) of attorneys' fees to be paid as follows," yet no allocation follows.  The

paragraph does not go on to identify how the attorneys' fees should be paid.

"Whether a contract's terms are ambiguous is a question of law decided by the court."

*Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 573 (2d Cir. 1993) (first citing

*W.W.W. Assocs. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990); and then citing *Van Wagner*

*Advertising Corp. v. S & M Enters.*, 492 N.E.2d 756, 758 (N.Y. 1986)).  "Contract language is

unambiguous when it has a definite and precise meaning and where there is no reasonable basis

for a difference of opinion."  *Klos v. Lotnicze*, 133 F.3d 164, 168 (2d Cir. 1997) (citing *Sayers v.*

*Rochester Tel. Corp. Supplemental Mgmt. Pension,* 7 F.3d 1091, 1094 (2d Cir.1993)).  "If a

contract is unambiguous, courts are required to give effect to the contract as written and may not

consider extrinsic evidence to alter or interpret its meaning."  *Consarc Corp.*, 996 F.2d at 573

(first citing *Care Travel Co. v. Pan Am. World Airways*, 944 F.2d 983, 987–88 (2d Cir. 1991);

then citing *Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990);

then citing *Hudson-Port Ewen Assocs. v. Chien Kuo*, 578 N.E.2d 435 (N.Y. 1991); and then

citing *W.W.W. Assocs.*, 566 N.E.2d at 642).  In other words, "extrinsic evidence may not be used

to create an ambiguity in an otherwise unambiguous agreement."  *Consarc Corp.*, 996 F.2d at

573 (citing *W.W.W. Assocs.*, 566 N.E.2d at 642).

"Contract language is ambiguous if it is capable of more than one meaning when viewed

objectively by a reasonably intelligent person who has examined the context of the entire

integrated agreement."  *Collins v. Harrison-Bode*, 303 F.3d 429, 433 (2d Cir. 2002) (internal

quotation marks omitted) (quoting *Compagnie Financiere de CIC et de L'Union Europeenne v.*

*Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 158 (2d Cir. 2000); then citing *Seiden*

*Assocs. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992); and then citing *Metro. Life Ins. Co.*, 906 F.2d at 889).

Here, the terms of payment for attorneys' fees under the Common Law Settlement Agreement are clearly contemplated by the agreement, yet the agreement fails to actually say that the attorneys' fees are to be paid to Settlement Counsel. Paragraph three does provide that "[t]he Parties agree and jointly represent that the Settlement Amount to be paid by [Travelers] pursuant to this Settlement Agreement constitutes fair and reasonable consideration." Defs.' Ex. 2, ¶ 3(d). "Parties" is a defined term, and includes Settlement Counsel. Read with this definition in mind, the agreement indicates that Settlement Counsel have agreed to accept the $20 million as "fair and reasonable consideration." "Settlement Amount" is also defined to include "the aggregate amount of the payment obligations set forth in Paragraph 3 . . . ." Defs.' Ex. 2, ¶ 1(q).

Additional evidence that the attorneys' fees were intended to go to Settlement Counsel may be found in paragraph seven. Paragraph seven of the Common Law Settlement Agreement is entitled "Attorneys' Fees." Defs.' Ex. 2, ¶ 7. That section states that "Travelers agrees not to challenge the individual contingency fee arrangements of any Settlement Counsel who is a signatory to this Settlement Agreement." Defs.' Ex. 2, ¶ 7. Although this language seems to affirmatively link Settlement Counsel to the $20 million in attorneys' fees, this section also raises the issue of individual contingency fee arrangements that may exist outside the four corners of the agreement. The Common Law Settlement Agreement does not define what the individual contingency fee arrangements are or whether the contingency fee arrangements refer to agreements between Settlement Counsel and their clients or to agreements between Settlement Counsel who were signatories to the Common Law Settlement Agreement and other non-signing counsel.

The ambiguity of the payment terms is only heightened after a more searching review of the rest of the Common Law Settlement Agreement. That the attorneys' fees may not necessarily go to Settlement Counsel is reinforced by paragraph 21. Paragraph 21 of the Common Law Settlement Agreement further provides that "Settlement Counsel represent only the clients listed on Exhibit C hereto." Defs.' Ex. 2, ¶ 21. This suggests Settlement Counsel represent only those persons on Exhibit C, and that those persons are the clients of Settlement Counsel. Paragraph 21 avers that only those persons listed on Exhibit C are being represented in the negotiation of the Common Law Settlement Agreement. Defs.' Ex. 2, ¶ 21. Confusingly, Paragraph 21 also states that

> Settlement Counsel agree to include in Exhibit C all existing clients of Settlement Counsel with pending or potential Common Law Direct Action Claims as well as existing clients of the following firms: (i) Law Offices of R. Bryan Nace; (ii) Richarson, Patrick, Westbrook & Brickman, LLC; (iii) Martin & Jones; (iv) The Lanier Law Firm and (v) The Simmons Firm LLC, with pending or potential Common Law Direct Action Claims.

Defs.' Ex. 2, ¶ 21. Read as a whole, this paragraph suggests that Settlement Counsel have undertaken to represent clients of other law firms who are not listed as Settlement Counsel and who were not signatories to the agreement. This creates further confusion regarding Travelers' promise not to challenge any contingency agreements of only the Settlement Counsel who signed the agreement.

Paragraph 21's reference to non-signing counsel opens the door to questions about the fees of the non-signing counsel with existing clients included in Exhibit C. If, pursuant to paragraph seven, Travelers may challenge the contingency fees of non-signing counsel, it is questionable whether non-signing counsel expect to be paid based on their contingency fees in the first place. This suggests non-signing counsel may expect to receive a part of the $20 million payment from Travelers. On that note, it seems odd that Settlement Counsel would expect to

receive $20 million from Travelers in addition to their own contingency fees from their clients as payment for the same services.  Unless, the services provided for the $20 million in attorneys' fees and the services provided for the contingency fees are entirely separate and distinct services.  Or, perhaps, paragraph seven actually means that Settlement Counsel have their own contingency fee arrangements with other non-signing counsel.  This is the very definition of ambiguity.

### 4.  The Parties' Understood the Attorneys' Fees Were to be Distributed Equally

"In construing settlement agreements, if ambiguities are created by the contract's language, then the court may look to the parties' statements and submissions to resolve the ambiguity by determining the parties' understandings of the ambiguous terms."  *Prince of Peace Enters. v. Top Quality Food Mkt., LLC*, 760 F. Supp. 2d 384, 397–98 (S.D.N.Y. 2011) (citing *Gessin Elec. Contractors, Inc. v. 95 Wall Assocs., LLC*, 903 N.Y.S.2d 26, 28 (N.Y. App. Div. 2010)).

Bogdan testified that at the time he executed the Common Law Settlement Agreement, it was his understanding that Settlement Counsel were being paid $20 million in attorneys' fees for having accomplished the settlement.  Tr. 6/13/2016 at 146:10–13.  At the time of execution, Bogdan expected one-fourth of the $20 million attorney fee fund.  Tr. 6/13/2016 at 147:10–12.  Bogdan based his expectations on "[t]he work that [he] did to bring about the settlement.  The filing of [his] cases against Travelers, the work [he] had done to develop documents against Travelers, [his] work on the mediation."  Tr. 6/13/2016 at 147:13–16.  Bogdan testified that at the time of execution, no one made any effort to "work out the allocation issues relating to the attorney fees."  Tr. 6/13/2016 at 146:25–147:3.  Bogdan testified that within one or two months

of executing the Common Law Settlement Agreement, he had communicated his expectations to the other Settlement Counsel.  Tr. 6/13/2016 at 147:17–148:3.

Carter testified that on May 21, 2004, later on the same day the Common Law Settlement Agreement was first executed, he sent out an email stating that they had signed a settlement agreement with Travelers, and that "Travelers is paying $70 million into a fund and $20 million in fees to Settlement Counsel for creating the fund."  Tr. 6/15/2016 at 216:20–218:3; Defs.' Ex. 9.  The May 21, 2004 email from "Bruce Carter," was sent to "Larry Madeksho," "Spencer Parris," "Eric Bogdan," "William Connelly," "Bill Kohlbum," "Lisa Smithfield," "Mike Riley," "Chris Madeksho," "Tom Bevan," "Randall Bono," "Jeffrey Cooper," "Bryan Nace," "Karl Novak," and "Angela Madeksho."  Defs.' Ex. 9.  Noticeably, Bogdan was one of the recipients of this email.  *Id.*  The email was sent on "Friday, May 21, 2004 8:03 AM," and the subject line was "Travelers Agreement Signed."  *Id.*  The email begins:

> Folks;
> At around 1 a.m. we signed a settlement agreement with Travelers setting up a Common Law Direct Action Fund.  The form of the agreement is based upon the draft we sent yesterday.  As soon as we receive copies of the final agreement we will send them out.
> In a nutshell, Travelers is paying $70 million into a fund and $20 million in fees to Settlement Counsel for creating the fund.  We completely revised the Exhibit C.  It will now be a listing of all of our cases.  We will have to work to create and compile the list.  We will need the caption information for every case.

*Id.*  This email indicates Travelers was paying $20 million to all four Settlement Counsel, as that term was written in capital letters and is a defined term in the Common Law Settlement Agreement.  The email states the $20 million was for Settlement Counsel's work in creating the fund.

It is clear from the record that there were fee splitting agreements between Madeksho and other asbestos plaintiffs' attorneys who were not named as Settlement Counsel.  Tr. 6/14/2016 at

166:23–167:3, 169: 7–12 (Madeksho's testimony); Tr. 6/15/2016 at 197:12–25 (Carter's testimony). These were the "other common law counsel" participating in the nationwide direct action project who referred clients to Madeksho, Carter and Bevan, often referred to as "co-counsel," who were not participating in the mediation process. Tr. 6/15/2016 at 166:6–9, 167:17–168:1 (Carter's testimony). The additional recipients of the May 21, 2004 email beyond the four Settlement Counsel, supports the conclusion that there were other asbestos plaintiffs' counsel not directly involved in the mediation process. Defs.' Ex. 9. Carter testified that unlike the rest of the non-participating co-counsel, Bogdan did not have a letter agreement to split 50% of his attorneys' fees with Madeksho. Tr. 6/15/2016 at 196:4–8, 197:16–198:1.

At some point after the Common Law Settlement Agreement was first executed on May 21, 2004, Madeksho tried to convince Bogdan to accept $500,000 as his share of the $20 million attorney fee fund. Tr. 6/14/2016 at 166:11–167:5, 167:19–168:2 (Madeksho's testimony); Tr. 6/13/2016 at 147:3–9, 148:4–6, 202:20–24 (Bogdan's testimony).[7] Bogdan claimed that there was never an agreement to pay him $500,000 as his "full share of the attorney fee fund." Tr. 6/13/2016 at 147:3–9, 148:4–6. Bogdan further testified that he was not "aware of any agreement or agreements among Mr. Madeksho, Mr. Carter, and Mr. Bevan related to the allocation of the $20 million." Tr. 6/13/2016 at 148:7–10. According to Madeksho, it was only after Bogdan refused to accept $500,000 in compensation that the fee sharing arrangements with the other non-participating co-counsel had to be changed. Tr. 6/14/2016 at 166:11–167:5, 167:19–168:2.

---

[7] On cross-examination, Bogdan was asked: "And during that week, between May 21st and May 24th, that was when Mr. Madeksho said to you, well, when we divide up this money, you're getting $500,000." Tr. 6/13/2016 at 202:20–22. In response, Bogdan replied: "It was during that time period. I'm not sure exactly. I know exactly where it was, but I don't remember the date." Tr. 6/13/2016 at 202:23–24. Bogdan stated he had disagreed with Madeksho. Tr. 6/13/2016 at 202:25–203:1.

Carter testified that he sent out an email on June 3, 2004, two weeks after the Common

Law Settlement Agreement had been executed, to non-participating co-counsel who had letter

fee sharing agreements with Madeksho.  Tr. 6/15/2016 at 220:9–20 (Carter's testimony on

redirect); Pls.' Ex. 8.  The email was an attempt to make changes to the letter agreements so that

Madeksho could receive $20 million in attorneys' fees.  Tr. 6/15/2016 at 220:18–20; Pls.' Ex. 8.

In order to achieve this result, the email stated that Madeksho and Carter had agreed to put the

$20 million in attorneys' fees back into the common law settlement fund.  Tr. 6/15/2016 at

196:3–11; Pls.' Ex. 8.  Bogdan did not receive this email.  Tr. 6/15/2016 at 196:3–11; Pls.' Ex. 8.

At trial, Carter testified that he had received authority from Bogdan and the rest of Settlement

Counsel to send out the June 3, 2004 email during mediation.[8]  Tr. 6/15/2016 at 189:1–23.

---

[8] At trial, Plaintiffs' counsel moved to strike Carter's response to this series of questions.  The ultimate controversy
was whether Plaintiffs' counsel, Mr. Duffy, had opened the door for Carter's response to what was discussed during
mediation.  The Court now rules that Mr. Duffy did indeed open the door to Carter's response, and Carter's
testimony is properly admitted.  The portion of the transcript supporting this decision is below:

    Q: Okay. But this email was sent in June 1 of 2004, which was a month after. So what gave you
    the authority at that point to send that email?
    A: The discussions with the four of us had **while we were in the mediation negotiating the
    terms of the agreement**.
    Q: And so the four of you agreed that you would send out that email. Is that right? Is that your
    answer -- or, I'm sorry, is that your testimony?
    A: The four of us didn't agree to me sending out a specific email, but they agreed for me to keep
    the -- I don't know how to -- trying to think of how to phrase this -- to try to work out a resolution
    so that Mr. Madeksho and I would be compensated at the level that we had all agreed to, and that
    we could put -- where we could also put the $20 million into the fund so as that we could placate
    people like Mr. Conley and Mr. Novak.
    Q: And when you say everybody else, did that include Mr. Bogdan?
    A: Yes.
    Q: So your testimony is that Mr. Bogdan agreed that you and Mr. Madeksho should have $20
    million to split.  Is that correct?
    A: That our compensation should be $20 million, yes.
    Q: And when did that occur?
    A: That happened while we were in mediation negotiating the fee portion of this.
        THE COURT: Strike
        MR. DUFFY: Move to strike, Your Honor.
        THE COURT: It's stricken.
        MR. DUFFY: Thank you.
        MR. HADDAD: Your Honor, I think he was asked a question –
        THE COURT: He was asked a question, but he said what was going on in mediation.
        MR. HADDAD: So what – I don't know what the witness is supposed to do to –
        THE COURT: Okay.  Let me hear what you two have to say.

Carter claimed that by the time he sent out the June 3, 2004 email to all non-participating

co-counsel, "we had already made the agreement at that point that [Bogdan's] compensation

would be $500,000." Tr. 6/15/2016 at 196:3–7; Pls.' Ex. 8. Carter admitted that there was no

such agreement in writing, and that Bogdan did not receive the June 3, 2004 email. Tr.

6/15/2016 at 196:3–11; Pls.' Ex. 8. Nevertheless, Carter claimed Bogdan had agreed to put the

$20 million in attorneys' fees back into the common law settlement fund, that Madeksho and

Carter should receive $20 million in attorneys' fees to split, and that the $20 million should come

from the individual fee sharing arrangements Madeksho had with non-participating co-counsel.

Tr. 6/15/2016 at 189:20–23. Carter claimed that both Bogdan and Bevan were going to receive

$500,000 from Madeksho instead of getting any money from the attorney fee fund established by

the Common Law Settlement Agreement. Tr. 6/15/2016 at 196:14–21. This proposed

---

MS. CYGANOWSKI: Well, let me just go further. He knew before he asked the
followup questions. Mr. Carter had said that we had discussed this during the discussions in the
mediation. And then Mr. Duffy didn't stop. He kept asking followup questions.

Tr. 6/15/2016 at 189:1–190:18 (emphasis added). The exchange went on for some time, before the Court eventually
concluded that the audio recording could not be played back immediately to verify what had been said. Tr.
6/15/2016 at 192:2–6. The Court then took Defendants' counsel's suggestion to reserve a ruling on the admissibility
of the testimony for later:

MS. CYGANOWSKI: A suggestion for 1 proceeding since we're all without the ability to
look at a daily transcript, that the Court reserve, that at such time as you see the transcript, you can
read yourself and then make a determination. If it's as we believed he opened the door, then we do
argue that the testimony should stand. If it is as you and Mr. Duffy believe, that he -- Mr. Duffy
had not opened the door, then it would be stricken consistent with your prior ruling.

THE COURT: Okay. Thank you because I was sort of coming to that, too. I'll give it to
the weight and see how the questions were at that.

MR. HADDAD: That's fine, Your Honor.

THE COURT: Okay.

MR. HADDAD: I'm amenable to that.

THE COURT: Yeah, I -- thank you, Ms. Cyganowski. That's --

THE WITNESS: And I apologize for the --

THE COURT: Well, it -- the answer is what it is. We've just got to interpret it at some
point.

BY MR. DUFFY:

Q: The -- as was mentioned, the email that was sent on June 3rd, 2004.

Tr. 6/15/2016 at 194:1–23 (emphasis added). Upon the record above, this Court now rules that indeed, Mr. Duffy
opened the door for Carter's response that the authority had been given during mediation discussions, which
concluded very early in morning on May 21, 2004. Carter's testimony is admissible.

amendment to the Common Law Settlement Agreement never occurred and was never approved. Tr. 6/15/2016 at 221:1–13.

Although Carter testified Bogdan had agreed to give the $20 million in attorneys' fees to Madeksho and Carter during mediation, this testimony conflicts with the May 21, 2004 email. The May 21, 2004 email was the first email Carter sent memorializing the terms of the Common Law Settlement Agreement, just seven hours after the agreement was signed.  *Id.*  It reflects an understanding of the terms that is closest to the time Settlement Counsel would have actually agreed to them.

The inference that Bogdan agreed, at any point, to give $20 million in attorneys' fees to Madeksho and Carter is not supported by the evidence.  As a matter of timing, it makes no sense that Carter would have waited an entire month after executing the Common Law Settlement Agreement to send out the June 3, 2004 email if, in fact, Bogdan had already agreed to give the entire $20 million in attorneys' fees to Carter and Madeksho.  It makes even less sense when one considers the fact that Carter sent out the May 21, 2004 email to the complete opposite effect, and Carter did not send the June 3, 2004 email to Bogdan.  Pls.' Ex. 8.  The email begins by saying "Larry and I have agreed to put the $20 million into the settlement fund."  Pls.' Ex. 8. This is very different from the original May 21, 2004 email, which used the more inclusive "we." Defs.' Ex. 9.  The June 3, 2004 email goes on:

> The attorneys fees from the fund will run between $20 million and $36 million, depending on whether your fee agreement is a 1/3 or 40% fee agreement.  In order to achieve the same result, that Larry and I have $20 million to split as we discussed, what changes can be made to accomplish this result?

Pls.' Ex. 8.  Clearly, the original Common Law Settlement Agreement did not contemplate Madeksho and Carter keeping the $20 million in attorneys' fees.  Otherwise, there would have been no need for any changes to be made to accomplish that result.

It makes no difference to this Court what contingency fees the non-signing asbestos plaintiffs' attorneys agreed to amongst themselves. That issue is not before this Court. Further, this Court has previously ruled that "fee arrangements between A[sbestos] H[ealth] claimants and their attorneys lie beyond the jurisdiction of the court . . . ." *In re Johns-Manville Corp.*, 68 B.R. 618, 632 (Bankr. S.D.N.Y. 1986) (first citing *In re Paso Del Norte Oil Co.*, 755 F.2d 421 (5th Cir. 1985); then citing *In re Shirley Duke Associates*, 611 F.2d 15 (2d Cir. 1979); and then citing *First State Bank & Trust Co. v. Sand Springs State Bank of Oklahoma*, 528 F.2d 350 (10th Cir. 1976)). The only issue under consideration here is what Settlement Counsel agreed to among each other.

This is not the first time the allocation of the attorneys' fees has come before this Court. This Court previously ruled on this issue in 2004. In approving the attorney fee fund, the Court took testimony from Carter at the evidentiary hearing held on July 6, 2004. Trial Transcript July 6, 2004 51:9–74:9, *In re Johns-Manville Corp.*, No. 82-11656, ECF No. 3818. Carter testified that he was "listed as settlement counsel as described within the agreement, and I am counsel of record or co-counsel of record for a number of cases in Ohio and I'm also participating counsel for cases in other jurisdictions, such as Texas." *Id.* at 51:25–52:6. In response to the question about what Carter's role was in the Common Law Settlement Agreement, Carter answered that he "was one of a number of attorneys that participated in the negotiation of the mediation context before Governor Cuomo that resulted in the agreements." *Id.* at 52:24–53:3. Carter testified that the Common Law Settlement Agreement "also calls for $20 million in attorneys fees for settlement counsel." *Id.* at 54:8–9. At the hearing, Carter was cross-examined on the following:

> Q: Let's go back a little bit to the attorney's fees. Are you requesting the Court order as part of the order today a 20 million dollar award to you?
> A: Not to me personally, no.
> Q: To the settlement counsel?

> A: I'm requesting that the Court approve the agreement and particularly that
> portion of the agreement where the $20 million agreed to between Travelers and
> settlement counsel would be allocated to settlement counsel, yes.

*Id.* at 58:6–18.  Carter stated that there was no other separate motion to approve the attorneys'

fees and that the release provision in the Common Law Settlement Agreement had been

"negotiated as part of the mediation by all of the counsel who were involved in the negotiations,"

including himself.  *Id.* at 59:4–10, 19–25.  In approving the settlement agreements, this Court

found "[t]he attorneys' fees to the  . . . Common Law Direct Action Plaintiffs' Counsel [to be]

fair, equitable and reasonable in light of the complexity of the litigations and the size of the

recoveries for the  . . . Common Law Direct Action Plaintiffs . . . ."  *See In re Johns-Manville*

*Corp.*, 2004 Bankr. LEXIS 2519, at *113 (Bankr. S.D.N.Y Aug. 17, 2004).

 Based on the record of the hearing before this Court on July 6, 2004, there is no

indication that the $20 million attorney fee fund was to be distributed unevenly among

Settlement Counsel.  In response to the very question of whether the entire $20 million in fees

was to be allocated to one person, Carter testified that the $20 million "would be allocated to

settlement counsel . . . ."  Trial Transcript July 6, 2004 58:6–18, *In re Johns-Manville Corp.*, No.

82-11656, ECF No. 3818.  Carter's testimony at the July 6, 2004 evidentiary hearing was that the

$20 million was to go to all of Settlement Counsel, and not to him personally.  If there had been

an agreement to give the entire $20 million to Carter and Madeksho, Carter should have said so

plainly upon the record of the hearing; Carter's response that the $20 million was to go to

Settlement Counsel, if untrue, would be perjury.  *Id.* at 51:9–74:9.

 The Common Law Settlement Agreement defines Settlement Counsel as four separate

entities: Bogdan, Bevan, Carter, and Modesksho.  The Common Law Settlement Agreement does

not otherwise divide the attorneys' fees.  Bogdan's expectations were that the settlement award

would be distributed pro rata, in equal fourths.  Settlement Counsel are all lawyers.  They are

sophisticated parties.  If they had wanted to split the $20 million in particular amounts between

themselves, they could easily have contracted to do so.  There is no credible testimony or other

evidence that demonstrates an intent to divide the fees unevenly at the time the Common Law

Settlement Agreement was executed.

This Court finds, perhaps somewhat redundantly, that the $20 million in attorneys' fees

was for the purpose of creating the settlement fund.  This means that the $20 million in

attorneys' fees were for services performed from the time mediation began, until the time the

Common Law Settlement Agreement was signed on May 21, 2004.  The first fact in support of

this conclusion is that Travelers agreed to pay the $20 million in attorneys' fees directly to

Settlement Counsel.  *See, e.g.*, Defs.' Ex. 2.  Travelers did not offer to pay the non-signing co-

counsel similar amounts of money, yet their clients were also listed on Exhibit C.  Bogdan and

Carter both believed the $20 million in attorneys' fees was for creating the Common Law

Settlement Fund.  Tr. 6/13/2016 at 146:10–147:16; Tr. 6/15/2016 at 216:20–218:3; Defs.' Ex. 9.

This Court has already found the amount awarded to be reasonable.  *In re Johns-Manville Corp.*,

2004 Bankr. LEXIS 2519, at *113.  This Court could not have found the attorney fee award to be

reasonable in August of 2004 if the $20 million was for future work that had not yet been

performed, such as the creation of the fund distribution procedures.

This Court finds that the parties here objectively intended to divide the $20 million in

attorneys' fees in equal fourths among Settlement Counsel.  Although there may be some

evidence to suggest that Madeksho, Carter and Bevan believed Bogdan was not entitled to a full

one quarter share of the $20 million settlement fee fund, dissatisfaction with the terms of an

agreement is not the same thing as actually having a different agreement.  *Klos v. Lotnicze*, 133

F.3d 164, 168 (2d Cir. 1997) (citations omitted).  This Court concludes that based on the

evidence and the record established, the parties' objective intent was to split the $20 million in

attorneys' fees among Settlement Counsel in equal fourths.

### 5.  Entitlement to Recover Under Quantum Meruit Not Proven

Even if this Court were to find that there was never any agreement on how to split the

funds, there is no evidence before this Court to support a recovery by any of Settlement Counsel

under quantum meruit.  To establish an entitlement to recover off the contract, a party seeking

"to recover in quantum meruit under New York law . . . must establish '(1) the performance of

services in good faith, (2) the acceptance of the services by the person to whom they are

rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the

services.'"  *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168,

175 (2d Cir. 2005) (quoting *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 69 (2d Cir. 2000)).

Assuming that Settlement Counsel performed their services in good faith and with the

expectation of compensation, the two remaining elements have not been proven.  By creating the

Common Law Settlement Fund, Settlement Counsel performed a service on behalf of all

claimants who may potentially recover from the Common Law Settlement Fund, not just their

own individual clients.  There was no argument made or evidence proffered at trial to show what

would constitute "acceptance" of Settlement Counsel's services.  Nor was there argument or

evidence regarding who would have had to accept Settlement Counsel's services.

The Court could assume that an accepting party could be any of the claimants to the

Common Law Settlement Fund.  The Court could further speculate that "acceptance" in that case

would be the submission of a claim to the Common Law Settlement Fund.  If that were the case,

it would not have been possible for this Court to approve the award of attorneys' fees on August

17, 2004, before the fund distribution procedures had been established and before any claim had

been submitted.  One could also hypothesize that Travelers was the accepting party, as Travelers

was the one paying for the services rendered by Settlement Counsel.  This would have created an

incurable conflict of interest for Settlement Counsel under any state's professional rules of

ethical conduct, as counsel cannot represent two parties against one another in the same

litigation.  Based on this line of reasoning, the attorneys' fees to Settlement Counsel could never

be approved under a theory of quantum meruit.

Further, there is no admissible evidence of the value of the work performed.  In order to

recover on a quantum meruit theory, there must be admissible evidence of the work performed

for which the attorney is entitled to recover.  "In determining the value of an attorney's services

in quantum meruit, the Court must consider the following factors: (1) the complexity of issues,

(2) the nature of the services, (3) the time spent, (4) the amount involved, (5) the professional

standing of counsel and (6) the results obtained."  *Metrano v. Eisen*, 1993 U.S. Dist. LEXIS 452,

at *3 (S.D.N.Y. Jan. 19, 1993) (citing *520 East 72nd Commercial Corp. v. 520 East 72nd Owner

Corp.*, 691 F. Supp. 728, 739 (S.D.N.Y. 1988), *aff'd*, 872 F.2d 1021 (2d Cir. 1989); and then

citing *Charles Weiner Corp. v. D. Jack Davis Corp.*, 448 N.Y.S.2d 998, 1000 ( N.Y. Civ. Ct.

1982)).  The parties did not submit evidence to show what was discussed during mediation, the

hurdles that were overcome, the difficulty of the negotiations, the actual amount of time spent

negotiating the Common Law Settlement Agreement, or the individual results obtained by

Settlement Counsel.

The only evidence before the Court was the controverted testimony that Madeksho took

the lead in negotiations and that Bogdan failed to contribute any value to the settlement.  Carter

testified that he attended most of the mediation sessions. Tr. 6/15/2016 at 146:14–17.  Bevan

similarly testified that he also attended mediation sessions.  Tr. 6/15/2016 at 38:15–18.  Bevan

and Carter both testified that Madeksho took the lead in the mediation sessions.  Tr. 6/15/2016 at

45:13–23, 147:22–25.

Bogdan testified that he attended every single mediation session, and that the mediation

lasted from March 2003 until May of 2004.  Tr. 6/13/2016 at 142:17–23.  Bogdan testified that

while Madeksho may have taken the lead in speaking to Travelers, "[they] all contributed [their]

opinions and comments as to what was taking place."  Tr. 6/13/2016 at 183:19–184:5.  Bogdan

further testified that the Common Law Settlement Agreement was largely based on the Statutory

Settlement Agreement, and as such, he did not remember adding any language.  Tr. 6/13/2016 at

186:8–11.

Madeksho testified that he came to the mediation sessions "a number of times."  Tr.

6/14/2016 at 126:9–11.  Madeksho asserted that in addition to the mediation sessions, the

negotiations were also conducted over the phone.  Tr. 6/14/2016 at 124:7–16.  Madeksho further

testified that he "was heading up the meditation, and then [he] invited three other guys to join in .

. . ."  Tr. 6/14/2016 at 122:16-17.  While remembering his leadership role, Madeksho went on to

elaborate that

> it reminded [him] when Andy Frankel had prepared that settlement agreement on
> the common  law cases, and it only named [him] as the settlement counsel.  And
> [he] was trying to give these other guys, you know, some credit and publicity, you
> know.  And [in his opinion] some of them earned it, and some of them didn't.

Tr. 6/14/2016 at 122:16–22.

Offering somewhat conflicting testimony, Frankel testified that although he knew

Madeksho had a history with Travelers, he wasn't sure Madeksho "stood out as . . . the leader in

the sense that, you know, Joe Rice was leading the statutory claims."  Tr. 6/14/2016 at 11:4–9.

Frankel stated he didn't recall any of the four parties to this litigation, Bogdan, Madeksho,

Carter, or Bevan, "taking a particular lead role" in the mediation.  Tr. 6/14/2016 at 20:7–8.

Frankel remembered that "occasionally, one or more people wasn't [sic] present, but [he didn't]

recall anybody standing out among those four as the lead negotiator."  Tr. 6/14/2016 at 20:13–

15.  Further, Frankel couldn't recall any one of them participating more or less than the others.

Tr. 6/14/2016 at 20:17–23.  Frankel testified that the common law settlement negotiations "used

the statutory settlement as the model, so it was a much faster process . . . ."  Tr. 6/14/2016 at

25:11–14.  Frankel testified that "Travelers took the laboring oar in drafting the statutory

settlement agreement," and that it had been used as a model for the Common Law Settlement

Agreement.  Tr. 6/14/2016 at 28:21–29:1.  In Frankel's opinion, Travelers was also largely

responsible for drafting the Common Law Settlement Agreement, although there had been a little

back and forth with Settlement Counsel on some of the terms.  Tr. 6/14/2016 at 28:21–29:12.

      The Defendants testified to a laundry list of work that was done before and after the

mediation.  As the purpose of the $20 million attorney fee fund here was to compensate

Settlement Counsel for the achievement of the Common Law Settlement Fund itself, the work

Settlement Counsel did prior to engaging in mediation and after signing the Common Law

Settlement Agreement is not relevant.  *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478, 100 S.

Ct. 745, 749 (1980) ("Since the decisions in *Trustees v. Greenough*, 105 U.S. 527 (1882), and

*Central Railroad & Banking Co. v. Pettus*, 113 U.S. 116 (1885), this Court has recognized

consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons

other than himself or his client is entitled to a reasonable attorney's fee from the fund as a

whole.").  This Court could not have approved the attorneys' fees as reasonable based on the

complexity of the work accomplished, if the attorneys' fees were meant to compensate additional future work that had not yet been completed.[9]

The only evidence the Court has is that the mediation sessions took place, and that Settlement Counsel participated in those discussions. Both Plaintiffs and Defendants vociferously objected to the admission of any substantive evidence from the mediation discussions. Even if evidence from the mediation sessions and discussions had been allowed, the billing records would have to support at least a $5 million recovery for each member of Settlement Counsel. On August 1, 2002, this Court first appointed a mediator in this matter. Order, *In re Johns-Manville Corp.*, No. 82-11656, Aug. 1, 2002, ECF No. 3446. The parties signed the Common Law Settlement Agreement on May 21, 2004. Defs' Ex. 2. Assuming that the applicable date to start measuring the amount of work accomplished by Settlement Counsel's is the first mediation order entered on August 1, 2002, that would mean roughly 22 months of compensable work. Assuming each individual member of Settlement Counsel worked 100 hour weeks dedicated solely to this mediation, never taking any vacation for almost two years, working a constant four weeks a month, totaling a whopping 8,800 hours for 22 months, Settlement Counsel would have to bill at an hourly rate of $568 just to merit an award of $5 million.[10] This Court has already found the $20 million award to Settlement Counsel to be fair

---

[9] Although the Court did not specify the legal standard under which it was approving the $20 million award of attorneys' fees, it is hard to believe that approval of fees for work not yet completed could be approved as "fair, equitable and reasonable in light of the complexity of the litigations and the size of the recoveries for the . . . Common Law Direct Action Plaintiffs . . . ." *In re Johns-Manville Corp.*, 2004 Bankr. LEXIS 2519, at *113 (Bankr. S.D.N.Y Aug. 17, 2004). Reasonableness review of the attorneys' fees could not have been possible before the actual work was performed. *See, e.g.*, *In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 216, 222 (2d Cir. 1987); *Smiley v. Sincoff*, 958 F.2d 498, 501 (2d Cir. 1992). Approval of attorneys' fees under 11 U.S.C. § 330 would also require a review of the reasonableness of the fees to be awarded based on the quality and value of the work performed. *See, e.g.*, *In re Tribeca Mkt., LLC*, 2014 U.S. Dist. LEXIS 122903, at *53 (S.D.N.Y. Sep. 2, 2014).
[10] Ronald Barliant represented Plaintiffs and Defendants in the bankruptcy proceedings with Travelers beginning in July of 2004. Tr. 6/13/2016 at 54:3–6. His hourly rate in 2004 was only $530. Defs' Ex. 88(hh).

and reasonable.  It is highly unlikely any such award could be sustained as reasonable on the basis of quantum meruit.

### 6.  **Bogdan Did Not Breach**

Defendants have argued that even if there was an agreement to allocate fees, Bogdan breached the agreement "due to his own willful failure to use his best efforts to consummate the settlement."  Defs.' Pre-Trial Br. 23.  Defendants' contend that Bogdan's refusal to collect any of the required 14,000 client releases was a breach of the "best efforts" clause in the Common Law Settlement Agreement.  *Id.* at 25.  All of the conditions precedent to the Common Law Settlement Agreement were met, including the requirement that 14,000 client releases be delivered to Travelers.  Travelers has paid the $20 million in attorneys' fees into an escrowed account.  This Court finds that there has been no breach of the terms of the Common Law Settlement Agreement.  Even if Defendants could argue that the Common Law Settlement Agreement created a separate duty that Bogdan owed to them, this Court finds there was no evidence adduced at trial to show Bogdan breached any such duty.

Although "New York law on 'best efforts' clauses is 'far from clear,'" the Second Circuit has acknowledged "that certain 'cases suggest that a best efforts clause imposes' at least 'an obligation to act with good faith in light of one's own capabilities.'"  *Cruz v. Fxdirectdealer, LLC*, 720 F.3d 115, 124 (2d Cir. 2013) (quoting *Bloor v. Falstaff Brewing Corp.*, 601 F.2d 609, 613 n.7 (2d Cir. 1979)).  "Under New York law, a contract need not explicitly define 'best efforts' for its 'best efforts' provision to be enforceable."  *Us Airways Grp. v. British Airways Plc*, 989 F. Supp. 482, 491 (S.D.N.Y. 1997) (citing *Bloor*, 454 F. Supp. at 266–67).  Where the contract does not provide a clear definition of what constitutes "best efforts," some New York courts have enforced the clause "when 'external standards or circumstances impart a reasonable

degree of certainty to the meaning of the phrase best efforts.'" *Cruz*, 720 F.3d at 124 (citation

omitted). "In some cases, New York courts have chosen to imply a standard for best efforts

when the contract has failed to provide its own definition." *Harbinger F&G, LLC v. OM Grp.*

*(UK) Ltd.*, 2015 U.S. Dist. LEXIS 33689, at *76–77 (S.D.N.Y. Mar. 18, 2015) (citations

omitted). Where the term is not defined, "and criteria by which to measure the parties' 'best

efforts' are lacking, the extrinsic circumstances concerning the parties' understanding of that

term may be considered by the finder of fact." *Us Airways Grp.*, 989 F. Supp. at 491 (citations

omitted).

The Common Law Settlement Agreement creates three conditions precedent in paragraph

two. Defs.' Ex. 2, ¶ 2. Paragraph two states that Travelers' obligations to pay the $70 million to

the Common Law Settlement Fund and the $20 million in attorneys' fees "are subject to and

made expressly contingent upon the satisfaction of [three] conditions precedent," including the

entry of an order finding that the common law suits were always enjoined pursuant to Manville's

Confirmation Order, entry of a final order approving the Common Law Settlement Agreement,

and "[e]xecution and delivery into escrow, within sixty ( 60) days of approval by the Bankruptcy

Court of this Settlement Agreement, of no fewer than fourteen thousand (14,000) general

releases . . . as further described in Paragraph 5 of this Settlement Agreement." Defs.' Ex. 2,

¶ 2(c). Paragraph five, entitled "Releases by Claimants," provides that

> [a]ny Person who receives payment from the Common Law Direct Action
> Settlement Fund shall sign and deliver to Travelers a general release, in
> substantially the form attached hereto as Exhibit B. To the extent applicable state
> law imposes any additional requirements in order to enforce in whole or in part
> the general releases contemplated by this Settlement Agreement, Settlement
> Counsel agree to take all steps necessary to obtain such general releases
> contemplated by this Settlement Agreement in a form that conforms with
> applicable state law.

Defs.' Ex. 2, ¶ 5.  Essentially, paragraph two creates a sub-category of claimants by overriding certain key provisions of paragraph five, namely the condition upon which any person must sign and deliver a general release to Travelers.  Some unspecified 14,000 individuals must provide a general release to Travelers within 60 days of the final approval of the Common Law Settlement Agreement.  This is instead of providing a release after receiving payment from the fund, as is contemplated by paragraph five.  If the 14,000 claimants do not provide the initial releases, there is no Common Law Settlement Fund in existence and paragraph five will never go into effect.

Paragraph 19 of the Common Law Settlement Agreement provides that

> [a]ll Parties will use their best efforts to obtain the outcomes sought by this Settlement Agreement, which shall include joint motion by Travelers and the Settlement Counsel to obtain, upon an evidentiary hearing, a Final Order approving this Settlement Agreement and entry of the order described in Section 2(a) containing prohibitions against Claims at least as broad as those contained in Exhibit A.

Defs.' Ex. 2, ¶ 19.  This makes explicit reference to the attempt to obtain the Court's approval of the Settlement Agreement and the entry of an order finding that the common law claims were always barred by Manville's Confirmation Order.  The clause specifically leaves out the condition precedent to obtain 14,000 releases, while including the other two condition precedents in paragraph two.

The parties to the contract were sophisticated.  The omission of the requirement to obtain 14,000 releases was not accidental.  In fact, it is highly likely that it was intentional, as the 14,000 signatures required the efforts of non-signing co-counsel.  Settlement Counsel on their own, did not have enough clients to produce the 14,000 signatures.  Tr. 6/15/2016 at 69:17–70:7; Defs.' Ex. 233.  Even including Bogdan's estimated 750 client releases, Bevan had roughly 12,000 clients, and Madeksho had maybe 20.  Defs.' Ex. 233; Tr. 6/15/2016 at 60:4–5, 110:3–22. In total, this amounts to only a potential 12,770 client releases, still 1,230 releases short of the

14,000 required.  Non-signing parties could not be contractually obligated to make best efforts.

Instead, "All Parties" were required to "use their best efforts to obtain the outcomes sought by

this Settlement Agreement . . . ."  Defs.' Ex. 2, ¶ 19.  Defendants have not persuasively argued

that the "best efforts" clause includes the obligation to obtain 14,000 releases, as that condition

precedent was specifically left out of the "best efforts" clause and required action on the part of

non-signing co-counsel.  Defs.' Ex. 2, ¶ 19; Defs.' Ex. 233; Tr. 6/15/2016 at 110:3–112:1.

Here, the only yardstick to measure what constitutes "best efforts" under the Common

Law Settlement Agreement is that best efforts "shall include joint motion by Travelers and the

Settlement Counsel to obtain" a final order approving the Common Law Settlement Agreement,

and an order from the bankruptcy court that the common law claims were always barred by

Manville's Confirmation Order.  Defs.' Ex. 2, ¶ 19.  The "best efforts" clause defines the

outcomes sought to include two of the three condition precedents provided for in paragraph two,

it specifically excludes the third condition precedent of obtaining 14,000 releases. *Id.*

Defendants provided no extrinsic evidence as to what "best efforts" would have meant in

relation to the other outcomes sought to be obtained by the Common Law Settlement Agreement.

Defendants only argue that "[a] party plainly violates [the best efforts] standard where, as here,

the party exercises *no effort* to satisfy the contingencies in a contract."  Defs.' Pre-Trial Br. 27

(citations omitted).  That Bogdan ultimately did not provide any of the 14,000 releases does not

automatically mean Bogdan did not make his "best efforts" in light of the contractual terms and

the facts at that time.  Indeed, Madeksho only obtained the 20 releases of his clients and Carter

obtained perhaps "a couple," according to Bevan.  Tr. 6/15/2016 at 111:3–7.  Clearly, best efforts

cannot literally be equated with the number of releases actually obtained.

Even if Bogdan had been required to use his "best efforts" to help obtain the 14,000

releases, it is not clear that Bogdan's failure to do so in light of the circumstances would have

constituted a material breach of the contract.  The Common Law Settlement Agreement was

signed on May 21, 2004 without any fund distribution procedures.  Tr. 6/13/2016 at 173:13–14;

Defs.' Ex. 2.  It took many years after multiple appeals for the order approving the Common Law

Settlement Agreement to become "final."  *See In re Johns-Manville Corp.*, 440 B.R. 604, 615

(Bankr. S.D.N.Y. 2010), *aff'd in part, rev'd in part sub nom. Travelers Indem. Co. v. Statutory &*

*Haw. Direct Action Settlement Counsel (In re Johns-Manville Corp)*, 845 F. Supp. 2d 584

(S.D.N.Y. 2012), *vacated sub nom. Common Law Settlement Counsel v. Travelers Indem. Co. (In*

*re Johns-Manville Corp.)*, 759 F.3d 206 (2d Cir. 2014) (affirming that the bankruptcy court's

orders became final on June 18, 2009).  On December 16, 2010, this Court held that Travelers'

obligations were triggered on June 18, 2009.  *See id.*  According to Bevan, the effort to obtain the

required 14,000 releases began sometime in late 2009.  Tr. 6/15/2016 at 68:2–12; Defs.' Ex. 135;

Defs.' Ex. 137.  Bevan testified that the releases were forwarded to the Common Law Settlement

Agreement Fund Administrator in August of 2010, roughly eight months after coordination

efforts had begun.  Tr. 6/15/2016 at 68:22–69:1.  Bevan further testified that he was unsure when

the 60 day deadline had really begun to run, although he believed it was sometime around June

of 2010.  Tr. 6/15/2016 at 68:20–25.  Bevan's firm coordinated the effort.  Tr. 6/15/2016 at

65:12–14.  It was not until many years later on July 22, 2014, that the Second Circuit ordered the

bankruptcy court's orders were final as of June 18, 2009.  *Common Law Settlement Counsel*, 759

F.3d at 218.  It was at this point that the final push to really formulate the fund distribution

procedures began.  Tr. 6/15/2016 at 84:6–9, 85:21–86:7.

Bogdan testified that when it came time to provide the general releases around 2009 or

2010, nearly six years after the Common Law Settlement Agreement had been executed, there

were still no fund distribution procedures.  Tr. 6/13/2016 at 162:18–24, 176:5–18.  Bogdan was

told releases were already being gathered by Bevan and he "was never told that there was a need

for [his] releases."  Tr. 6/13/2016 at 175:4–9.  Bogdan testified there were emails back and forth

about him obtaining the releases at that time:

> Then I asked, well, what about the fund distribution plan?  How do I know if my
> clients are even going to . . . well, are my clients going to qualify.  No one told
> me, yes, my clients are going to qualify.  No one told me when a fund distribution
> plan would be filed.  I had sought a fund distribution plan to be filed from day one
> back in the summer of 2004.  And there was no fund distribution plan.  I had a
> duty to my clients not to get releases . . . .

Tr. 6/13/2016 at 176:5–18.  Bogdan believed he was protecting his clients' interests by waiting

to obtain the general releases from them while there was still no fund distribution plan in place.

*Id.*  Without the fund distribution plan, Bogdan could make no representations to his clients

about whether they were likely to receive a payout in exchange.  Tr. 6/13/2016 at 176:5–18.  In

light of the circumstances, even if Bogdan had been contractually obligated to use his best efforts

to help obtain the 14,000 releases, this Court is hard pressed to find Bogdan breached any ill-

defined best efforts obligation in this instance.  Bogdan is entitled to his contractual recovery.

### 7.  Bogdan's Recovery Would Not Be Adjusted Downward

Defendants' parallel argument that Bogdan is not entitled to any recovery based on

Bogdan's alleged violations of Rule 1.1(c) and Rule 1.5(a) of the New York Rules of

Professional Conduct ("New York Rule") must be dismissed.  Defendants attempt to characterize

Bogdan's post-settlement behavior as obstructionist and as contributing to the delay in the

consummation of the Common Law Settlement Agreement.  Defs.' Pre-Trial Br. 28.  Defendants

claim that Bogdan's actions were adverse to the interest of Bogdan's own clients, in violation of

New York Rule 1.1(c), and that any award of fees would be excessive under New York Rule

1.5(a).  Defendants' arguments amount to little more than the fact that Bogdan and the rest of

Settlement Counsel had a falling out.

Defendants' arguments that Bogdan has not provided competent services to his clients

and that his fees are excessive are devoid of the case or controversy requirement.  The preamble

to the New York Rules, paragraph 12, clearly states that

> Violation of a Rule should not itself give rise to a cause of action against a lawyer
> nor should it create any presumption in such a case that a legal duty has been
> breached. In addition, violation of a Rule does not necessarily warrant any other
> nondisciplinary remedy, such as disqualification of a lawyer in pending litigation.
> The Rules are designed to provide guidance to lawyers and to provide a structure
> for regulating conduct through disciplinary agencies. They are not designed to be
> a basis for civil liability. Furthermore, the purpose of the Rules can be subverted
> when they are invoked by opposing parties as procedural weapons. The fact that a
> Rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer
> under the administration of a disciplinary authority, does not imply that an
> antagonist in a collateral proceeding or transaction has standing to seek
> enforcement of the Rule. Nevertheless, because the Rules do establish standards
> of conduct by lawyers, a lawyer's violation of a Rule may be evidence of breach
> of the applicable standard of conduct.

N. Y. Rules of Prof'l Conduct Preamble [12] (2014).  An alleged violation of a New York Rule

of Professional Conduct does not create its own civil cause of action.  In other words, Defendants

may not argue that Bogdan's alleged violation of a New York Rule of Professional Conduct

gives rise to its own civil remedy.  A violation of an ethical rule may only be used to support a

claim for breach of a separate legal duty or standard of conduct.

New York Rule 1.1 deals with competence.  New York Rule 1.1(c) provides that "A

lawyer shall not intentionally: (1) fail to seek the objectives of the client through reasonably

available means permitted by law and these Rules; or (2) prejudice or damage the client during

the course of the representation except as permitted or required by these Rules."  Defendants do

not represent any of Bogdan's clients—they are merely arguing that Bogdan breached his duty of

competence to his clients and as a result, that violation should preclude him from recovering

under the Common Law Settlement Agreement.  This is not evidence that Bogdan breached

some other legal duty.  This is precisely what the Preamble prohibits.  As such, there is no actual

cause of action in controversy on these grounds before this Court.

Similarly, Defendants claim that Bogdan breached New York Rule 1.5(a), which

prohibits excessive fees on the basis of reasonableness:  "A lawyer shall not make an agreement

for, charge, or collect an excessive or illegal fee or expense.  A fee is excessive when, after a

review of the facts, a reasonable lawyer would be left with a definite and firm conviction that the

fee is excessive."  Defendants claim that by virtue of Bogdan's alleged violation of Rule 1.5(a),

under quantum meruit Bogdan is not entitled to recover anything from the attorneys' fees created

by the Common Law Settlement Agreement.  Defs.' Pre-Trial Br. 21.  This Court has already

held that quantum meruit is inapplicable here.  Even if it were, Bogdan's fee award would not be

reduced based on an alleged violation of New York Rule 1.5(a).  This Court has already held the

award of attorneys' fees to be reasonable and fair based on the complexity of the case and the

issues involved.  *In re Johns-Manville Corp.*, 2004 Bankr. LEXIS 2519, at *113 (Bankr.

S.D.N.Y Aug. 17, 2004).  Further, an argument that the fees were excessive is not evidence that

Bogdan has breached a separate, applicable standard of conduct or legal duty.

Defendants' own conduct evidences an intent to frustrate the mediation, and their acts

took place while mediation was still underway.  Carter testified that he had initially objected to

participating in mediation and had drafted the opposition to Travelers' motion for a temporary

restraining order and argued the motion before this Court.  Tr. 6/15/2016 at 139:5–21.  This

Court denied the objection to mediation twice and Carter took the matter up on appeal.  Tr.

6/15/2016 at 139:15–21.  Bevan testified while mediation was ongoing, one of his jobs was to

keep the Ohio state court asbestos litigation against Travelers "in play as long as possible," so

they could obtain a settlement with Travelers.  Tr. 6/15/2016 at 25:24–26:6.  The trial courts had

already granted Travelers' motions to dismiss, so Bevan and Carter filed appeals.  Tr. 6/15/2016

at 26:3–11.  This activity happened after this Court had entered the temporary restraining orders.

Regardless of these facts and the inferences that could plausibly be drawn from them, this Court

has already determined that the attorneys' fees to Settlement Counsel were reasonable, fair and

equitable given the complexity of the circumstances.  *See In re Johns-Manville Corp.*, 2004

Bankr. LEXIS 2519, at *113 (Bankr. S.D.N.Y. Aug. 17, 2004).  The Court must dismiss

Defendants' arguments to reduce Bogdan's fees based on alleged ethical violations, or his

actions to frustrate consummation of the Common Law Settlement Agreement.

### 8. Bogdan is Not Liable For the Additional Attorneys' Fees of Barliant

Defendants also claim that Bogdan is now liable for the expenses of joint counsel

retained to represent Settlement Counsel around the time this Court approved the Common Law

Settlement Agreement in 2004.  Joint counsel was led by Mr. Ronald Barliant ("Barliant") while

at the Goldberg Kohn law firm, and represented all four Settlement Counsel on the appeals of the

Common Law Settlement Agreement from July of 2004 through January 18, 2011.  Defs.' Pre-

Trial Br. 28; Tr. 6/13/2016 at 6–13.  On January 18, 2011, Barliant withdrew as Bogdan's

representation by order of this Court.  Tr. 6/13/2016 at 6–3.  Between 2004 and 2010, Barliant's

legal fees were paid by Travelers.  *See* Defs.' Ex. 89, ¶ 4; Tr. 6/13/2016 at 96:3–18.  After

Travelers refused to pay Barliant's legal fees for continued representation of Settlement Counsel,

Barliant approached Madeksho about his fees.  Tr. 6/13/2016 at 98:4.  Barliant initially proposed

a contingency fee arrangement, which Madeksho rejected as too complicated.  Tr. 6/13/2016 at

1–6.  Madeksho offered to pay Barliant's fees himself instead.  Tr. 6/13/2016 at 96:6–8.  Barliant

testified that to the best of his memory, he sent his bills to Madeksho's office.  Tr. 6/13/2016 at

96:8–11.  Bevan testified that while he was never asked to pay Barliant's fees, he "volunteered"

to pay half the bills.  Tr. 6/15/2016 at 62:8–17.  Bevan testified that the total amount of

Barliant's fees were "just shy of 600,000" and so he paid half of them, roughly $300,000.  Tr.

6/15/2016 at 63:7–9.  Madeksho himself testified to the following:

> Q: Do you remember who paid for Mr. Barliant's fees?
> A: Well, at one point, Travelers had paid for it, and then they quit. And –
> Q: And what happened at that point?
> A: That -- I took over paying the fees, and then Mr. Bevan said, well, here, Larry,
> let me chip in, too. And so Mr. Bevan paid some, too.

Tr. 6/14/2016 at 131:5–11.  From Madeksho's own account, he never asked anyone else to help

pay Barliant's legal fees.  Madeksho, on his own, negotiated with Barliant to continue

representation, without consulting the other three members of Settlement Counsel.  Bevan

contributed to Barliant's fees of his own volition.  There is no evidence of an agreement or

promise by Bogdan to help pay Barliant's fees.  The facts indicate Madeksho never even

intended to ask anyone to help pay Barliant's fees.  Assuming for the sake of argument that

Madeksho had anticipated Settlement Counsel would contribute to Barliant's fees, it is doubtful

Madeksho had the authority to bind Settlement Counsel to an agreement to further retain Barliant

without their explicit consent.  The Court finds that Bogdan is not liable to Madeksho for the

payment of any of Barliant's fees that Madeksho agreed to pay.

## <u>CONCLUSION</u>

This Court finds that the attorneys' fees provided for in the Common Law Settlement

Agreement shall be distributed in equal, one quarter parts to Bogdan, Madeksho, Carter, and

Bevan. On Defendants' motion for judgment on partial findings at the close of Plaintiffs' case,

this Court determined on the record of the hearing held on June 14, 2016 that Bevan has not

waived his right to the attorneys' fees provided for in the Common Law Settlement Agreement.

For the foregoing reasons and to the extent indicated herein, this Court grants judgment to the

Plaintiffs on the issues presented at trial.  Plaintiffs are ordered to submit an order in conformity

with this opinion within fourteen (14) days of the entry of this decision.



**/s/ Cecelia G. Morris**

_____

**Dated: August 26, 2016**
       **Poughkeepsie, New York**

**Hon. Cecelia G. Morris**
**Chief U.S. Bankruptcy Judge**